**STATE of Minnesota, Respondent,**

v.

**Karon Allen WHITTAKER, Appellant.**

**No. CX–96–1641.**

Supreme Court of Minnesota.

Aug. 28, 1997.

Evan Rosen, Rosen & Russo, P.A., Golden Valley, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

## OPINION

ANDERSON, Justice.

Late in the evening of January 29, 1996, two armed men forcibly entered a home in the city of Minneapolis, Minnesota and shot two of its residents, fatally injuring one of them. Appellant Karon Allen Whittaker was arrested shortly after the homicide while running away from the crime scene. When arrested, Whittaker was wearing a jacket which resembled the witnesses' descriptions of the clothing worn by one of the armed men. A grand jury indicted Whittaker on ten charges: first-degree murder, attempted first-degree murder, seven counts of assault, and first-degree burglary. A jury found Whittaker guilty of all of the charges, and the court imposed an aggregate sentence of life imprisonment plus 396 months. On appeal, Whittaker raises five grounds for reversal of his convictions: (1) grand juror bias in violation of his due process rights; (2) improper exclusion of reverse *Spreigl* evidence; (3) improper prosecutorial comment on his exercise of the right to remain silent; (4) insufficient evidence to support his convictions; and (5) unfair multiple consecutive sentencing. We affirm.

Monday, January 29, 1996, was a colder-than-usual, mid-winter evening in Minneapolis, with temperatures reaching thirteen to twenty degrees below zero. At approximately 11 p.m. that evening, eight persons were gathered at Barbara Brandt's residence at 2126 Fourth Street North in Minneapolis. Barbara Brandt (Brandt) was packing moving boxes in the kitchen. Brandt's son, 18-year-old Bradley Ruedebusch (Brad), who lived at the residence, was eating pizza in the kitchen. Ronald Fairbanks (Fairbanks), a friend of Brandt's who lived at the residence,

was also eating pizza in the kitchen. Brandt's brother-in-law, Kevin Schmitt, was sitting at the dining room table playing Yahtzee with Brandt's daughter, 12–year–old Pamela Brandt (Pamela), and Brandt's brother, Curtis Ruedebusch. Brandt's sister, Bonnie Schmitt, was in the dining room talking on a cordless telephone. Brad's friend, Myron Stokes (Stokes), was eating pizza in the dining room.

It is undisputed that Brad had been selling marijuana out of the Brandt residence. Brandt thought that Brad kept up to $2,000 in a pop can safe in the basement. Stokes thought that Brad may have kept in his possession up to $20,000 in cash proceeds from selling marijuana.

Sometime before 11:20 p.m., Stokes answered a knock at the front door. He heard a person say, "Is Brad there?" Two African–American men were at the door. One of the men was wearing a jacket with red as the prominent color and the other was wearing a dark black coat or jacket. Each of the men wore some kind of face covering. Fairbanks testified that the man in the red jacket carried a semi-automatic pistol, and the man in the black coat carried a sawed-off rifle.

The two armed men entered the residence and began issuing instructions. Stokes was ordered at gunpoint to get down on the floor, and told to crawl beneath the dining room table. Stokes was then told to put his arms up on a chair. The man in the red jacket ordered Pamela to get under the dining room table. Kevin Schmitt laid down on the dining room floor. Bonnie Schmitt froze in place, and the man in the dark jacket told her four different times to get down. After the fourth time, Kevin Schmitt grabbed her, pulling her down to the floor. Curtis Ruedebusch hesitated in his response to the instructions, and one of the men put a gun to the side of his head and told him to get down because all he wanted was the money. Curtis Ruedebusch complied, and laid on top of Pamela under the dining room table.

In addition to the two armed men who forcibly entered the Brandt residence, Stokes thought he saw a third person wearing a brown "cargo" jacket subsequently enter the residence and run upstairs. Kevin Schmitt also thought he heard someone run upstairs. This third person was not heard or seen again in the residence.

The man in the red jacket entered the kitchen, pointed his gun at the people in the room, and said, "Give up the money," or "Where's the money at?" The man in the black coat followed the man in the red jacket into the kitchen. Brad put up his hands, said, "What's up, man. What's up?" and then picked up a kitchen knife. Brad held the knife up, but Brandt and Bonnie Schmitt yelled at him to put the knife down, and at some point he dropped the knife.

At about this time, Brandt's dog jumped up on the man with the red jacket, and the man shot and killed the dog. Brad then began wrestling with the man in the black coat. The man in the red jacket pointed his gun at Brad. Fairbanks said, "Don't shoot," but the man turned toward Fairbanks and shot him once, then turned toward Brad and shot him several times, and then turned back and shot Fairbanks several more times.

After the shooting, Brandt was crying and told the two armed men to please get what they wanted and leave. One of the men then ran downstairs to the basement and came back upstairs. The man then kicked Brad a couple of times and said "Let's get out of here." At this point, the two armed men ran out the front door. The two men were in the house between five and ten minutes. After the two men left, Brandt and Bonnie Schmitt immediately called for an ambulance and for the police. Brad died at the scene of gunshot wounds. Fairbanks survived after being shot once in the left hip and three times in the right hip.

Sometime between 11:18 and 11:21 p.m., Minneapolis Police Officer Gregory Zipoy was driving south on Fourth Street North, and as he crossed the intersection of 22nd Avenue, he observed an African–American male on the sidewalk in the south two-thirds of the block. The man was wearing dark clothing and a black hat. The man crossed over from the main sidewalk to the boulevard, walked across Fourth Street, and continued walking in the street on 21st Avenue. Two minutes after observing this individual,

Officer Zipoy received a radio call about the shooting at 2126 Fourth Street North.

That same evening, Minneapolis Police Officer Mark Beaupre was sitting in his private car working as an off-duty security guard for Kemps Dairy Company. His car was facing east, 10 to 15 feet away from the intersection of Fourth Street North and 21st Avenue. This is approximately one-half block south of the Brandt residence. At about the time of the homicide, Officer Beaupre saw three African–American males run by his car. Two men in dark clothing were on one side of the street and one man in a "red jacket with white stripes" was on the other side of the street. Officer Beaupre first saw the men heading south on Fourth Street North. Then, he observed them head west on 21st Avenue and turn south on Lyndale Avenue. A few minutes after seeing the three men— about 11:23 p.m.—Officer Beaupre heard a call on his police radio reporting a possible shooting at the Brandt residence. Within a minute, Officer Beaupre used his radio to advise other officers that possible suspects had run by him.

Minneapolis Police Officers Gregory Kossan and James Burns were on patrol duty together that evening and heard the radio call about the shooting. They also heard a dispatch of Officer Beaupre's observations. The two officers spotted two men "starting to walk together" near the intersection of Aldrich Avenue North and 18th Avenue. This is approximately three and one-half blocks southwest of the Brandt residence. One of the men was wearing a red and white "Starter" jacket and the other was wearing a black jacket. The officers pulled up near the men, turned on the squad car's spotlights, got out of the car with their weapons drawn, and commanded the men to approach the car. The man in the red jacket kept walking and eventually began to run. The man in the black coat ran in a different direction.

Officer Kossan chased the man in the red jacket, caught him, and arrested him. The man in the red jacket was later identified as appellant Karon Allen Whittaker. At the time of his arrest, Whittaker was carrying a single glove and a stocking cap. He was wearing a hooded "Starter" jacket that is predominantly red with a white stripe around the chest area and a black stripe underneath the white stripe. The jacket also has a red, white, and black "Wisconsin Badger" emblem on each sleeve and the word "Wisconsin" written underneath each "Wisconsin Badger" emblem and on the left breast. Whittaker was also wearing brown or green corduroy pants. Whittaker is an African–American male, between 5'9" and 5'10" in height, with a medium build. He was 20 years old at the time of his arrest.

Officer Burns chased and arrested the man in the black coat. The man in the black coat had a black bandanna around his neck, and was carrying a second bandanna in his pocket. He was also carrying a .22 caliber semi-automatic pistol with seven bullets inside it, a .22 caliber sawed-off rifle, and some loose ammunition. The man in the black coat was later identified as Karon Baldwin. Later, when Baldwin was taken to the Hennepin County Medical Center for blood and urine tests, Officers Kossan and Burns heard Baldwin say, "I'm not tripping. I did the crime. I'll do the time." Baldwin later denied committing the crime, but admitted owning the sawed-off rifle found on him.

Whittaker was indicted by a Hennepin County grand jury. On appeal, he objects to the presence of two persons on the grand jury. During the grand jury proceedings, grand jurors nine and ten recognized some of the witnesses. Upon learning this information, the state brought grand jurors nine and ten to hearings before the district court. At the hearings, the court questioned the two jurors individually.

Grand juror nine, a Broadway Bar and Pizza restaurant employee, stated that she had worked the closing shift with the murder victim, Brad, for a few of the 17 months during which Brad worked at the restaurant. Grand juror nine stated that she and Brad "weren't close or social," and that she "didn't know anything about him other than that he was there, and that was it." Grand juror nine also stated that she had worked with assault victim Stokes at the same restaurant, and that she recognized two of the testifying police officers as patrons of the restaurant. Grand juror ten stated that she knew Bonnie

Schmitt from a support group that Bonnie intermittently attended, and stated that she had met Bonnie's sister "in passing." Grand jurors nine and ten both stated that they could be impartial. The district court then concluded that the two jurors were qualified to sit on the grand jury. Grand jurors nine and ten continued to participate in the grand jury proceedings. The defense did not make a pretrial motion to dismiss the indictment due to grand juror bias.

At trial, the state presented the testimony of the seven surviving persons present at the Brandt residence on the night of the murder. None of them was asked to make an in-court identification of Whittaker. Stokes testified that the jacket worn by one of the armed men who came to the residence was red with white stripes. Stokes identified the jacket that Whittaker was wearing when arrested as the same jacket that this armed man was wearing on the night of the murder. A police officer testified that immediately after the murder Stokes told him that one of the men was wearing a red "Starter" jacket with writing on it, possibly the words "Running Rebels."[1] Stokes recalled making this statement, and recalled telling the police on the night of the murder that the man with the red and white jacket was about 5'6" or 5'7" in height and "skinny." Stokes also told the police that he thought he recognized the man as having come to see Brad in the past and thought he would be able to recognize the man if he saw him again, but Stokes was unable to identify Whittaker from two photographic line-ups.

Fairbanks testified that one of the armed men was tall and wore a red and white jacket. Fairbanks also made an in-court identification of Whittaker's jacket as the red and white jacket that this man was wearing. Fairbanks testified that he did not notice the "Wisconsin Badger" emblems on the sleeves of the jacket because the man was facing toward him. Fairbanks also testified that he did not notice the black stripe on the jacket.

Pamela testified that one of the armed men had a red coat that she believed had black and white stripes on it. She also posi-

tively identified Whittaker's jacket as the jacket this man was wearing. A police officer testified that immediately after the murder, Pamela had stated that one of the men was about 15 years old, approximately 5'6" in height, and wearing a red jacket with black and white in it that she thought was a "Starter" jacket. Pamela also recalled telling a different officer that even though she could not see the man's teeth on the night of the murder, she had seen the man before and he "had kind of crooked teeth." Officer Kossan testified that, according to the arrest report, Whittaker has "normal" teeth. Pamela admitted testifying before the grand jury that Whittaker's jacket looked like the one the man was wearing because "the guy who came, wears it often and I remember the stripes, the white and black stripes going through it."

Kevin Schmitt testified that one of the armed men had a "red jacket with a stripe or something, some kind of pattern across the middle, with a red hood up." Kevin Schmitt was certain that the jacket had white stripes. He identified Whittaker's jacket as looking like the jacket that this armed man was wearing on the night of the murder. Kevin Schmitt admitted that he did not mention anything about white and black in the jacket to the police on the night of the murder. Kevin Schmitt also admitted that he did not recall that the jacket had white and black stripes until after he was shown a picture of Whittaker's jacket when testifying before the grand jury.

Officer Beaupre identified Whittaker in court as the individual who ran by him and was subsequently arrested. Officers Kossan and Burns also made in-court identifications. A forensic firearms and tool mark examiner testified that the three bullets taken from Brad's body could have been fired from the pistol which Baldwin was carrying when arrested, but not from the sawed-off rifle which Baldwin was also carrying when arrested and admitted owning.

After having rested its case, but before closing arguments commenced, the defense

---

1. The "University of Nevada Las Vegas (UNLV) Runnin' Rebels" emblem features a soldier hold-

ing a rifle. The UNLV colors are red, white, and black.

made a motion to reopen its case. The defense sought to introduce as reverse *Spreigl* evidence a circular dated May 3, 1996 that Whittaker's mother found on her door on the evening of May 24, 1996. The circular described a robbery that occurred at Girard Avenue North and 18th Avenue in Minneapolis, approximately eight blocks from the Brandt residence. According to the circular, on May 1 at 7 a.m., an 18–year–old African–American male with a thin build robbed at gunpoint two 14–year–old boys who were on their way to school. Among other items, the suspect took one of the victim's shoes. The suspect was wearing a black stocking cap and an inside-out black "Starter" jacket with red lining, giving the appearance of a red jacket. The circular also described a similar robbery of a 14–year–old youth that occurred on April 24, 1996 at North Commons Park, ten to twelve blocks from the Brandt residence. The district court refused to permit the defense to reopen its case, excluding this reverse *Spreigl* evidence on the ground that the evidence did not have "sufficient probative value."

During a lengthy closing argument, the prosecutor made eight comments which Whittaker now contends were an improper comment on his right to remain silent. The defense made no objections during the prosecutor's closing argument and did not seek a curative jury instruction. In his closing argument, defense counsel argued that the man in the red jacket could have been someone other than Whittaker and that Whittaker could have run from the police because of his status as a young African–American male rather than because he committed the crime.

At sentencing, Whittaker denied committing any crime. He claimed that he ran from the police because he had crack-cocaine in his pocket. He asked for a new trial on the ground that the all-white jury was unfair toward him. The district court concluded that Whittaker had received a fair trial, and sentenced him to: life imprisonment for the first-degree murder of Brad; a consecutive 180–month sentence for the first-degree attempted murder of Fairbanks; six 36–month

sentences consecutive to the 180–month sentence for each of the second-degree assaults of Brandt, Pamela, Stokes, Kevin Schmitt, Bonnie Schmitt, and Curtis Ruedebusch;[2] and a concurrent 108–month sentence for first-degree burglary. The court stated that the consecutive sentences did not exaggerate the criminality of Whittaker's conduct because all of the victims experienced terror when assaulted and some of the victims were assaulted in their own home.

On direct appeal to this court, Whittaker raises five grounds for reversal. First, he claims that his due process rights were violated by the presence on the grand jury of persons who knew the murder victim and/or knew a testifying witness. Second, he claims that the district court committed reversible error when it excluded the defense's reverse *Spreigl* evidence. Third, Whittaker alleges that the prosecutor improperly commented on Whittaker's exercise of his Fifth Amendment right to remain silent. Fourth, he contends that insufficient evidence exists to support the jury verdict. Finally, Whittaker argues that the imposition of multiple consecutive sentences unfairly exaggerated the criminality of his conduct. We affirm.

I.

We first address Whittaker's claim that his due process rights were violated by the presence on the grand jury of persons who knew the murder victim and/or knew a witness who testified during the grand jury proceedings. Whittaker contends that it was not possible for grand jurors nine and ten to have been impartial because of their personal knowledge of Brad, Stokes, Bonnie Schmitt, and two of the testifying police officers.

A grand jury consists of not more than 23, nor fewer than 16 members, and shall not proceed to any business unless 16 members are present. Minn. R.Crim. P. 18.03, subd. 1. The district court may excuse a grand juror at any time for cause shown. Minn. R.Crim. P. 18.09. Among other grounds, cause will be shown if the court is satisfied that the juror is unable to act impartially:

---

**2.** The count of second-degree assault of Fairbanks merged for sentencing purposes with the

first degree attempted murder count. *See* Minn. Stat. § 609.04 (1996).

An objection to an individual grand juror may be based on the cause that the grand juror * * * is of a state of mind in reference to the case or to either party which shall satisfy the court, in the exercise of a sound discretion, that the juror cannot act impartially and without prejudice to the substantial rights of the party objecting.

Minn.Stat. § 628.54 (1996).

A party's proper means for objecting to an individual grand juror is by motion to dismiss the indictment. Minn. R.Crim. P. 18.02, subd. 1. A motion to dismiss an indictment may be based upon the ground "that an individual juror is not legally qualified or that the juror's state of mind prevented the juror from acting impartially." *Id.* at subd. 2. The indictment shall not be dismissed if 12 or more legally qualified jurors concurred in finding the indictment. *Id.* Whittaker did not bring any motion to dismiss his indictment on the grounds of grand juror bias. Further, his attorney acknowledged at oral argument that at least 12 of the 17 grand jurors on the grand jury panel were legally qualified and concurred in finding his indictment.

On appeal, Whittaker is essentially seeking to overturn his indictment on the ground that the application of Minn.Stat. § 628.54 and Minn. R.Crim. P. 18.02 violated his rights under the state due process clause. *See* Minn. Const. art. 1, § 7. He argues that the district court did not conduct a meaningful inquiry into the impartiality of grand jurors nine and ten. He further contends that, even if the court's inquiry complied with the broad mandate of section 628.54 and rule 18.02, his due process rights were still violated. He claims that his due process rights were violated by the possibility that two biased grand jurors could influence the other jurors during deliberations, but nonetheless under rule 18.02 the indictment would be deemed valid if 12 qualified jurors concurred in the indictment. Whittaker's claims fail

both on procedural grounds and on the merits.

■ First, Whittaker's claims are improperly and untimely raised. Under Minn. R.Crim. P. 17.06, subd. 2, all objections to the indictment must be made by motion. *See State v. Drieman,* 457 N.W.2d 703, 709 (Minn.1990). A motion, other than an objection to jurisdiction or a claim that the indictment fails to charge an offense, must be served not later than three days before the omnibus hearing, unless the time is extended for good cause. *See* Minn. R.Crim. P. 10.04, 17.06. Failure to include in a motion all defenses, objections, issues, and requests then available constitutes a waiver thereof, unless the court for good cause shown grants relief from the waiver. Minn. R.Crim. P. 10.03; *see, e.g., Drieman,* 457 N.W.2d at 709 (declining to consider defendant's objections to his indictment based on prosecutor's conduct during grand jury proceedings because defendant did not raise these objections in his original motion challenging the indictment and did not show cause for granting relief from the waiver). We conclude that Whittaker failed to properly raise any objection to the indictment in a rule 17.06 motion and has failed to show cause for granting relief from the waiver; therefore, this court need not consider his claim on the merits.

■ Second, even if this court were to reach the merits of Whittaker's arguments, his claims would fail because there is no law to support them. A presumption of regularity attaches to a grand jury indictment, and courts will rarely invalidate the indictment. *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn. 1988). This is particularly true when the indictment is challenged after the defendant is found guilty in a fair trial, as in the case at bar. *Id.* The legal standard for dismissal of grand jurors, like the legal standard for dismissal of petit jurors, is a discretionary standard.[3] Imposing a more restrictive standard upon the qualifications of grand jurors would raise the standard for grand jurors higher

---

3. *Compare* Minn.Stat. § 628.54 *and* Minn. R.Crim. P. 18.02 *with* Minn. R.Crim. P. 26.02 (allowing challenge of juror for cause if the juror has a state of mind "which satisfies the court that the juror cannot try the case impartially * * *."); *see also State v. Howard,* 324 N.W.2d

216, 220 (Minn.1982) ("If, as here, the jurors indicate their intention to set aside any preconceived notions, and demonstrate to the satisfaction of the trial judge that they are able to do so, this court will not lightly substitute its own judgment.").

than the standard for petit jurors. This is inconsistent with the law of our state given that the constitution expressly guarantees the right to a speedy and public trial by an impartial jury, while the right to an impartial grand jury is implied. *See* Minn. Const. art 1, § 6. In addition, imposing a more restrictive standard upon the qualifications of grand jurors would burden the indictment process with few countervailing benefits. We conclude that Whittaker has presented no basis for invalidating the indictment.

## II.

We next address Whittaker's reverse *Spreigl* claim. Whittaker contends that the district court committed reversible error when it excluded from evidence a circular describing two robberies that were committed in the same neighborhood as the Brandt residence. These robberies occurred approximately four months after Brad's murder, and the suspect in the robberies was an African–American male wearing an inside-out black "Starter" jacket with red lining. Whittaker was in jail when these robberies occurred. He claims that admission of this evidence would have generated a reasonable doubt as to his guilt by showing that another person may have committed the murder and burglary at the Brandt residence. The district court determined that the evidence did not have "sufficient probative value."

Evidentiary rulings generally rest within the district court's discretion and will not be reversed absent a clear abuse of that discretion. *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). Under Minn. R. Evid. 404(b), evidence of another crime, wrong, or act is not admissible at trial to prove the character of a person in order to show action in conformity therewith. Evidence of another crime, wrong, or act may be admissible, however, for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Minn. R. Evid. 404(b). Such evidence shall not be admitted in a criminal prosecution unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence. *Id.*

Pursuant to rule 404(b), a defendant may seek to introduce evidence of other crimes or misconduct of a third person to prove that the third person, rather than the defendant, committed the crime charged. *State v. Johnson*, 568 N.W.2d 426 (Minn., filed Aug. 28, 1997); *see State v. Deans*, 356 N.W.2d 674, 676 (Minn.1984); *State v. Bock*, 229 Minn. 449, 458, 39 N.W.2d 887, 892 (1949). The defendant's offer of proof in this situation is referred to as "reverse *Spreigl*" evidence. *Johnson*, 568 N.W.2d at 428. The foundational requirements for reverse *Spreigl* evidence are: (1) clear and convincing evidence that the third person participated in the reverse *Spreigl* incident; (2) a showing that the reverse *Spreigl* evidence is relevant and material to the defendant's case; and (3) a showing that the probative value of the reverse *Spreigl* evidence outweighs its potential for unfair prejudice. *Id.*

We conclude that the circular was not relevant to Whittaker's case and, therefore, does not satisfy the second requirement for admission of reverse *Spreigl* evidence. To satisfy the relevancy requirement when reverse *Spreigl* evidence is offered to establish the identity of the perpetrator, the reverse *Spreigl* incident must be similar to the charged offense either in time, location, or modus operandi. *See Johnson*, 568 N.W.2d at 428. This court will readily uphold the admission of so-called "signature" crimes to prove the identity of the perpetrator; however, a reverse *Spreigl* crime need not be a "signature" crime provided that it is sufficiently or substantially similar to the crime charged. *See id.*

In this case, the crimes described in the circular are not sufficiently or substantially similar to the crimes charged against Whittaker. The circular describes two street robberies during which the suspect took the shoes of two 14–year–old youths. The offenses charged against Whittaker involve a homicide, an attempted murder, and assaults perpetrated while burglarizing a residence, purportedly for drug money. In addition, the jacket worn by the suspect described in the circular was a black "Starter" jacket with red lining. The "Starter" jacket worn by the

man at the Brandt residence, conversely, was described by the witnesses as red and white. None of the witnesses thought that the jacket was solely red in color, and none of the witnesses described an inside-out black "Starter" jacket.[4] We conclude that the district court did not abuse its discretion by excluding the circular as reverse *Spreigl* evidence.

### III.

We next turn to Whittaker's claim that, during closing argument, the prosecutor improperly commented on Whittaker's exercise of his Fifth Amendment right to remain silent. Throughout 75 transcript pages of the prosecutor's closing argument, Whittaker isolates eight specific comments:

Was he [Whittaker] jogging? Just happened to be jogging by?

\* \* \* \*

And why did Whittaker run first? I think there's a pretty good reason why and he knows it and you know it.

\* \* \* \*

You know, you have to decide whether he [Whittaker] was jogging here.

\* \* \* \*

When he [Whittaker] runs away, he's not running home to show his report card or anything \* \* \*.

\* \* \* \*

We know that Whittaker was right there. Was he out jogging, just happening to be running by?

\* \* \* \*

And they're just strolling? What is this? It's not the county fair or anything.

\* \* \* \*

Now, is it possible that all of this is just one huge mistake? Is it possible? Is it reasonable that he [Whittaker] was just jogging down there? You have to decide whether it is reasonable to think that somebody else did this. Is it really reasonable? Because in order to explain, you have to say, well, you know, he's jogging down the road.

\* \* \* \*

It's not reasonable. So we can exclude the old, hey, I was just out for a jog and they got the wrong guy.

▮▮▮▮ As an initial point, we note that Whittaker failed to object to any of these comments at trial and failed to ask for a curative jury instruction. Generally, a defendant is deemed to have waived the right to raise an issue on appeal concerning the prosecutor's comments during closing argument if the defendant fails to object or seek cautionary instructions. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984) (citations omitted); *see, e.g., State v. Kline*, 306 N.W.2d 132, 133 (Minn.1981); *State v. Flom*, 285 N.W.2d 476, 477–78 (Minn.1979). However, a court may reverse a conviction despite the defendant's failure to object or seek instructions if the prosecutor's comments were unduly prejudicial. *Parker*, 353 N.W.2d at 127–28. The defendant's failure to object implies that the comments were not prejudicial. *See id.; State v. Marquetti*, 322 N.W.2d 316, 318 (Minn.1982). We conclude that by failing to object or seek cautionary instructions and by failing to show undue prejudice, Whittaker has waived his right to raise an issue on appeal concerning the prosecutor's comments during closing argument.

▮▮▮▮ Even if this court were to reach the merits of Whittaker's arguments regard-

---

**4.** We note that the Louisiana appellate case of *State v. Mosby*, 581 So.2d 1060 (La.Ct.App.1991), aff'd, 595 So.2d 1135 (La.1992), relied upon by Whittaker, is factually distinguishable from the case at bar. In *Mosby*, the defendant, a young, slim-built African–American male, was being prosecuted for robbing a white male of his bank bag while the male was in a bank line to deposit the money. *Id.* at 1065–66. The *Mosby* court held that it was error, albeit harmless, to exclude evidence that another young, slim built African–American male had been arrested and charged with two similar robberies involving taking bank deposit bags from white males at two nearby banks. *Id.* The similarities between the reverse *Spreigl* evidence and the charged crime in *Mosby* were far greater than the similarities between the crimes described in the circular offered by Whittaker as reverse *Spreigl* evidence and the crimes charged against him. It is also notable that, on appeal, the Louisiana Supreme Court held that the other crimes evidence offered in *Mosby* was properly excluded because its probative value was outweighed by the danger of unfair prejudice. *State v. Mosby*, 595 So.2d 1135, 1140 (La.1992).

ing improper prosecutorial comment, we would not reverse his convictions. The rule under federal and state law is that a prosecutor at a defendant's trial shall not allude to the defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965) (holding that comment on refusal to testify violates Fifth Amendment to the United States Constitution); Minn.Stat. § 611.11 (1996). Adverse comment on the defendant's election not to testify may be either per se reversible error or harmless error. Adverse comment is per se reversible error when the comment is extensive, when the comment stresses to the jury that an inference of guilt from silence is a basis for conviction, and when there is evidence that could have supported acquittal. *State v. Naylor*, 474 N.W.2d 314, 321 (Minn. 1991) (citations omitted). When the above factors are not present, the comment is subject to harmless error analysis. *Id.* In this case, looking at the prosecutor's comments in the context of the entire closing argument, we conclude that harmless error analysis does apply because the comments were not extensive, were not stressed to the jury as a basis for conviction, and were not part of a case in which the evidence could have supported acquittal.

◼ We further conclude, applying harmless error analysis, that any errors made by the prosecutor were harmless. In *Naylor*, this court addressed a statement analogous to the prosecutor's "he knows it and you know it" comment and upheld the defendant's conviction. In *Naylor*, the prosecutor commented that "as some of the witnesses said, 'I'm telling the truth and the defendant knows the truth.'" *Id.* The court concluded that harmless error analysis applied because the comments were not extensive, were not stressed to the jury as a basis for conviction, and were not part of a case in which the evidence could have supported acquittal. *See id.* The court further concluded that the error, if any, was harmless. *See id.*

In *State v. Schneider*, this court addressed comments similar to the prosecutor's speculations whether Whittaker was "out jogging, just happening to be running by" at the time of his arrest. 311 Minn. 566, 249 N.W.2d 720 (1977). In *Schneider*, the prosecutor anticipated the defense counsel's theory of the case and pointed out that this theory could not explain certain facts. *Id.* at 567, 249 N.W.2d at 721–22. The prosecutor also commented, "We don't have any evidence before us to refute these things." *Id.*, 249 N.W.2d at 722. This court held that the prosecutor's statements could have had the effect of commenting on the defendant's failure to testify, because the only person who could have refuted the statements was the defendant. *Id.* We affirmed the defendant's conviction, however, because we concluded that the prosecutor's comments "were not extensive," and "did not stress defendant's silence per se as a basis for conviction." *Id.* We also noted that the evidence of the defendant's guilt was strong, and that the defendant did not object or move for a mistrial, but chose instead to rely on his own argument to the jury and a curative instruction. *Id.* In this case, the prosecutor correctly anticipated the defense's theory of the case that Whittaker did in fact just happen to be running by and pointed out that this theory could not explain certain facts.[5] In addition, Whittaker failed to object to the prosecutor's comments or move for a mistrial and chose instead to rely on his own argument to the jury, which supports an inference that the errors, if any, were harmless.

◼ Whittaker also challenges the prosecutor's comments that "[y]ou have to decide whether it is reasonable to think that somebody else did this," and "in order to explain, you have to say, well, you know, he's jogging down the road." These comments may have implied that Whittaker had the burden of proving that he was innocent. *See United States v. Skandier*, 758 F.2d 43, 45 (1st Cir.

---

5. Whittaker points to the Pennsylvania Supreme Court's decision in *Commonwealth v. Brenizer*, which reversed a defendant's jury convictions for second-degree murder and kidnapping due to the improper and prejudicial effect of the prosecu-

tor's "explanations" of the defendant's not guilty plea to the jury. 467 Pa. 347, 349–51, 356 A.2d 784, 785–86 (1976). *Brenizer* is distinguishable, however, because the prosecutor in that case extensively imputed testimony to the defendant.

1985).[6] However, at the beginning of the prosecutor's closing argument, the prosecutor thoroughly explained the presumption of innocence and the concept of proof beyond a reasonable doubt. During jury instructions, the district court also explained the presumption of innocence and the state's burden of proof. *See id.* at 45 (holding that the district court properly corrected the prosecutor's closing remarks, in which he questioned how defense counsel would be able to explain a different story, by immediately instructing the jury as to the proper burden of proof). We conclude that Whittaker has presented no grounds for reversal based on the prosecutor's closing argument.

## IV.

■■■ Whittaker claims that he is "a victim of mistaken identity" and that the evidence submitted at trial is insufficient to support his convictions. He admits that he fits the broad description of the young African–American man in a red and white jacket. However, he alleges that none of the witnesses stated that they saw black in the jacket until after the grand jury proceedings, during which they were shown photographs of the jacket he was wearing when arrested. He also points out that while Stokes thought the jacket may have had a "UNLV Running Rebels" emblem on it, none of the witnesses noticed a "Wisconsin Badgers" emblem. He therefore contends that the only explanation is that the armed man who shot Brad was wearing a red and white jacket without black stripes and without the "Wisconsin Badgers" emblem.

■■■ When considering a claim of insufficiency of the evidence, this court must ascertain whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978) (citations omitted). This court cannot retry the facts, but must view the evidence in a light most favorable to the state and assume that the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.* Circumstantial evidence will permit a conclusion of sufficiency if a detailed review of the evidence and the reasonable inferences drawn from the evidence are "consistent only with the defendant's guilt and inconsistent with any rational hypothesis except that of guilt." *State v. Bowles,* 530 N.W.2d 521, 534 (Minn.1995).

We conclude that sufficient evidence exists to support the jury's verdict. The jury could have believed the testimony of Stokes, Fairbanks, Pamela, and Kevin Schmitt that one of the armed men was wearing a red and white jacket and that this jacket was the same one Whittaker was wearing when he was arrested. The jury also could have believed that Pamela saw black in the jacket and told the police immediately after the murder that she thought the jacket was a red "Starter" jacket with black and white in it. In addition, the jury could have believed that Stokes saw black in the jacket and described the jacket to police as being a "Starter" jacket with a "UNLV Running Rebels" emblem, which emblem is red, white, and black like the "Wisconsin Badgers" emblem. Considering the stressful nature of the incident, the fact that not all of the witnesses recognized black in the jacket and none saw the "Wisconsin Badgers" emblem does not undermine the reasonableness of the jury's inference that the witnesses were describing Whittaker's jacket. The jury also could have believed Officer Beaupre's testimony that Whittaker was the man in a red jacket with white stripes whom he saw running past his car in a direction away from the Brandt residence and who was arrested moments later.

A detailed review of the circumstantial evidence and the reasonable inferences drawn from the evidence is consistent with Whittaker's guilt and inconsistent with any other rational hypothesis. Not only does Whittaker fit the description of one of the armed men present at the Brandt residence, but also the record shows that when arrested,

---

**6.** *Cf. State v. Porter,* 526 N.W.2d 359, 363 (Minn. 1995) (holding that prosecutor's comment on defendant's failure to call witnesses or to contradict testimony constituted prosecutorial misconduct because comment might suggest to the jury that defendant bears some burden of proof).

Whittaker was with Baldwin, who admitted committing the crime and was carrying a pistol which was consistent with the murder weapon. The hypothesis that some other person in a red and white jacket escaped the scene and Whittaker happened to meet up with Baldwin late in the evening during sub-zero weather, only to be falsely arrested for the crime, does not appear to be a rational hypothesis. Given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that Whittaker was guilty. We hold that sufficient evidence existed to support the jury's verdict.

## V.

■ Finally, we consider Whittaker's claim that the imposition of multiple consecutive sentences unfairly exaggerated the criminality of his conduct. The district court imposed a life sentence for first-degree murder, a consecutive 180–month term for first-degree attempted murder, six 36–month terms consecutive to the 180–month term and to each other for the second-degree assaults, and a concurrent 108–month term for first-degree burglary.

■ The general rule is that if a person's conduct constitutes more than one offense, the person may be punished for only one of the offenses. Minn.Stat. § 609.035 (1994). This court has carved out an exception to this multiple punishment bar when multiple victims are involved, and has upheld multiple sentences for multiple crimes arising from the same behavioral incident. *See State v. Bookwalter,* 541 N.W.2d 290, 294 (Minn. 1995); *State v. Marquardt,* 294 N.W.2d 849, 850 (Minn.1980). In *Marquardt,* this court stated the rule that one sentence may be imposed per victim in multiple-victim cases as long as the multiple sentences "do not unfairly exaggerate the criminality of the defendant's conduct." 294 N.W.2d at 851. This court generally will not review the district court's exercise of its discretion in sentencing when the sentences imposed are all within the guidelines range. *State v. Norris,* 428 N.W.2d 61, 70 (Minn.1988) (citing *State v. Williams,* 337 N.W.2d 387, 391 (Minn.1983)).

As the state points out, Whittaker's conduct involved the "invasion of a residence" and "complete terrorization of all of its occupants." Guns were waved at the assault victims, and several of the victims, including a 12–year–old girl, were individually ordered at gunpoint to the floor. One of the assault victims crouched in the corner and covered her head as she witnessed her son's murder. We conclude that the district court's imposition of consecutive sentences for Whittaker's assaults on these multiple victims did not unfairly exaggerate the criminality of Whittaker's conduct.

Affirmed.

TOMLJANOVICH, Justice (concurring specially).

I concur only with the result reached by the majority for the reasons set forth in my concurrence in *State v. Johnson,* 568 N.W.2d 426 (Minn., filed Aug. 28, 1997).