STATE of Minnesota, Respondent,

v.

Michael Carrasco SONTOYA,
Appellant.

No. A09–1480.

Supreme Court of Minnesota.

Sept. 16, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Susan Gaertner, Ramsey County Attorney, Mitchell L. Rothman, Assistant County Attorney, St. Paul, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, G. Tony Atwal, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Michael Carrasco Sontoya was found guilty by a Ramsey County jury of first-degree murder while committing first-degree criminal sexual conduct, and second-degree unintentional murder while committing first-degree assault, arising out of the death of G.R. on September 30, 2008. The district court entered judgment of conviction for first-degree murder while committing first-degree criminal sexual conduct, and sentenced Sontoya to life in prison without the possibility of release. On direct appeal, Sontoya argues that the medical examiner's expert testimony that G.R.'s injuries were due to sexual assault constituted reversible error that deprived him of a fair trial. Sontoya also asserts various pro se arguments. Because we conclude that Sontoya's arguments lack merit, we affirm.

At 6:48 a.m. on September 30, 2008, emergency personnel were dispatched to Sontoya's upper level duplex located in St. Paul in response to Sontoya's 911 call. Paramedics found G.R. fully dressed on the bedroom floor. She was not breathing; she had no detectable pulse; her body was cold and stiff; and her veins were flat. Sontoya told paramedics that G.R. was alive right before they arrived. Paramedics noticed blood on the floor and wall, as well as clotted blood in G.R.'s airway. The blood on the wall appeared to have been partially wiped away. Splatters of blood led from the bedroom through the hallway to the bathroom. Sontoya explained that there was blood on the walls and carpet because G.R. was menstruating. The paramedics found very little blood on G.R.'s clothing, but found dried blood in her umbilicus and fingernail beds.

Sontoya told emergency personnel that G.R. and he had been at a bar the previous evening, and then went to his duplex around 2:00 a.m., had sex, and went to sleep. When Sontoya awoke, G.R. was unresponsive; Sontoya called his brother, a police officer, who told him how to perform CPR, and told him to call 911.

Sontoya agreed to go to the St. Paul Police Department for further questioning. He was pat-searched, and his cell phone was seized and deposited as evidence in the property room. After waiving his *Miranda* rights, Sontoya was interviewed about 9:30 that morning and 2:30 that afternoon. He stated that during their sexual activity, he put two fingers inside G.R.'s vagina, and at her request he inserted his fist into her vagina. After their sexual activity, G.R. dressed herself and they went to bed. The medical examiner disputed Sontoya's version of events by testifying that had G.R. dressed herself, the blood pooled in her abdomen would have bled out onto her clothing. When Sontoya awoke shortly after 6:30 a.m., G.R. was unresponsive. He gave her a couple of breaths, and then called his brother for help. Sontoya denied having "rough sex" with G.R. and stated that the sex had been "totally consensual."

Later that morning, police executed a search warrant at Sontoya's duplex. Police discovered large amounts of blood on the bedroom floor, walls, and carpeting, and vomit on the carpet. The medical examiner opined that G.R. vomited when she lost consciousness. Several bloody hand impressions were visible on the bedroom walls and were consistent with attempts to clean the wall with rags or paper towels. Sontoya admitted that he wiped some blood off the walls. Blood had soaked through the carpet, and there was blood on the top and bottom of the mattress and on the top of the box spring. Two nearby plastic bags held items of women's clothing that were bloody, and a wastebasket in the bathroom contained bloody paper towels.

The autopsy conducted that same day revealed a 14–inch laceration through the vaginal wall into the pelvic area and the abdominal cavity. G.R.'s bowel was disrupted, her diaphragm was hemorrhaged, her spleen and liver were lacerated, and her anal area was torn. Her arms were spotted with bruises caused by pressure of fingerprints, and there were nearly two dozen fresh bruises on her legs, including large areas of hemorrhage on her right hip and left buttock. Her scalp had 14 separate bruises that were inflicted shortly before her death. G.R. was menstruating, but was not experiencing a heavy discharge.

DNA from two or more persons was found on Sontoya's ring. The predominate DNA contributor was consistent with G.R.'s profile. Blood on G.R., the box spring and mattress, the bedroom wall, the bedroom door, a baseboard in the hallway, a paper towel in the bathroom wastebasket, and a shirt in one of the plastic bags contained DNA from one source consistent with G.R.'s profile. The vomit on the carpet also contained DNA consistent with G.R.'s profile.

Sontoya was indicted for first-degree murder while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence in violation of Minn.Stat. § 609.185(a)(2) (2008) and with unintentional second-degree murder while committing first-degree assault in violation of Minn.Stat. § 609.19, subd. 2(1) (2008).

At trial, the State presented testimony of emergency personnel, Sontoya's statements, the results of the autopsy, and DNA evidence. Also, a photograph of G.R. taken with Sontoya's cell phone at 5:40 a.m. that morning was submitted. In the photograph, G.R. was lying naked and unresponsive on the bedroom floor. But Sontoya did not call 911 until almost one hour later, and when emergency personnel arrived, G.R. was fully dressed.

Sontoya's defense was that the sex was consensual and G.R.'s injuries and death

were accidental. He did not testify. The jury found Sontoya guilty of both charges. The district court entered judgment of conviction on the first-degree criminal-sexual-conduct murder verdict and sentenced Sontoya to life in prison without the possibility of release.

## I.

Sontoya argues the medical examiner's unobjected-to expert testimony that G.R. was sexually assaulted constitutes reversible error, and therefore his conviction must be reversed and a new trial ordered.

We have discretion to review unobjected-to error under the plain error rule. Minn. R.Crim. P. 31.02; *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). When prosecutorial misconduct is not alleged, the defendant has the burden of proving (1) an error, (2) that is plain, and (3) affects substantial rights. *See Griller,* 583 N.W.2d at 740 (citing *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). If these three prongs are satisfied, we "assess[ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

An error is "plain" if it is clear or obvious. *State v. Strommen,* 648 N.W.2d 681, 688 (Minn.2002) (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Typically this is shown if the error contravenes case law, a rule, or a standard of conduct. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). Substantial rights are affected when a plain error was prejudicial and affected the outcome of the case. *Griller,* 583 N.W.2d at 741. Plain error is prejudicial when there is a reasonable likelihood that the error had a significant effect on the jury's verdict. *Id.* The defendant bears a "heavy burden" of persuasion on this prong. *Id.*

The admission of an expert's opinion testimony generally rests within the discretion of the district court. *State v. Moore,* 699 N.W.2d 733, 739 (Minn. 2005). Opinion testimony is not objectionable merely because it embraces an ultimate issue to be decided by the jury. Minn. R. Evid. 704. In exercising its discretion, the district court must examine whether the expert is qualified to express the opinion, and whether the opinion is helpful because it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Minn. R. Evid. 702. Moreover, the district court must use special care to ensure that the jury understands that the defendant's presumption of innocence is maintained and that the jury is responsible for judging the credibility of the expert testimony. *Moore,* 699 N.W.2d at 739–40 (citing *State v. Grecinger,* 569 N.W.2d 189, 193 (Minn. 1997)).

Previously, we have concluded that expert testimony is not helpful if the expert opinion "is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions . . . ." *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980). Thus, expert testimony is inadmissible if "the jury is in as good a position to reach a decision as the expert." *State v. Saldana,* 324 N.W.2d 227, 229, 232 (Minn.1982) (concluding that a counselor's testimony that complainant was a victim of sexual assault and rape was error because the testimony was not helpful to the jury); *see also Moore,* 699 N.W.2d at 740; *State v. Chambers,* 507 N.W.2d 237, 239 (Minn.1993). Expert testimony may also be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion, or misleading the jury. *See* Minn. R. Evid. 403.

The testimony that resulted in the claimed error is indicated in italics below:

State: As a result of that autopsy, and based on your training and experience, did you come to a conclusion as to the cause and manner of [G.R.]'s · death?

Expert: Yes.

State: What was that conclusion?

Expert: You want the cause of death?

State: Cause of death first.

Expert: Exsanguination due to multiple traumatic injuries *due to a sexual assault.*

State: She bled to death from the sexual assault?

Expert: Yes.

State: Manner?

Expert: Homicide.

(Emphasis added.)

▆▆▆▆▆ In addressing an alleged error under the plain-error rule, "[i]f a defendant fails to establish that the claimed error affected his substantial rights, we need not consider the other factors."[1] *State v. Goelz,* 743 N.W.2d 249, 258 (Minn. 2007). Assuming without deciding that it was plain error to admit the medical examiner's testimony, we examine whether the testimony affected Sontoya's substantial rights. Under the prejudice prong, we examine whether there is a reasonable likelihood that the error had a significant effect on the jury's verdict. *Griller,* 583 N.W.2d at 741. Sontoya bears a "heavy burden" of persuasion on this prong. *Id.* To determine whether the error had a significant effect on the jury's verdict, we review the strength of the State's case, the pervasiveness of the error, and whether the defendant had an opportunity to respond to the testimony. *See State v. Davis,* 735 N.W.2d 674, 682 (Minn.2007).

An examination of those factors demonstrates that admission of the expert testimony did not affect Sontoya's substantial rights. The evidence of Sontoya's guilt was overwhelming. The number, location, and severity of G.R.'s injuries exceed any injuries that might have occurred accidentally during consensual sex. And this evidence shows that the injuries were inflicted with force or violence. Sontoya's efforts to clean G.R.'s body, dress her, and wipe the blood from his bedroom walls provide additional evidence of guilt. The photograph found on Sontoya's cell phone documented the original position of G.R.'s nude body, and indicated that Sontoya was aware of G.R.'s unresponsiveness for nearly an hour before he called 911.

Also, the assumed error was not pervasive. The disputed testimony was a small portion of the medical examiner's testimony.[2] While the prosecutor referenced the

---

1. The concurrence concludes that the admission of the medical examiner's testimony was an error that was plain. The court, however, is not required to address all three prongs of the plain-error rule. Instead it may conclude that the alleged error did not affect a defendant's substantial rights without deciding the other two prongs. *State v. Goelz,* 743 N.W.2d 249, 258 (Minn.2007); *see also State v. Atkinson,* 774 N.W.2d 584, 596 (Minn.2009) (skipping the first two prongs of the plain-error test and considering only whether the alleged plain error was prejudicial); *State v. Manley,*

664 N.W.2d 275, 283 (Minn.2003) (noting that while "[n]ormally, we would consider each prong of the plain-error test in order," the court "need not do so" in this case because the defendant "cannot establish that the claimed error affected his substantial rights").

2. The medical examiner's testimony was 75 pages, of which the disputed testimony was about one-half of a page. The prosecutor repeated the testimony three times when questioning the medical examiner: (1) "She bled to death from the sexual assault?"; (2)

disputed testimony three times during closing argument,[3] the focus of the closing argument was on the nature and extent of G.R.'s injuries, Sontoya's statements to police, and the photograph of G.R. on Sontoya's cell phone. Moreover, the jury instructions placed appropriate limits on the expert witness's testimony. Specifically, the jury was instructed that they were "the sole judges of whether a witness is to be believed and of the weight to be given a witness's testimony," and that expert opinion evidence "is entitled to neither more nor less consideration by you than any other evidence."

Further, Sontoya responded to the disputed testimony during closing argument. Sontoya contended that the medical examiner was biased and not credible. Specifically, he argued that the medical examiner "has taken off his medical badge and he has become Quincy.... [He] told you it was a crim sexual assault." Essentially, he argued that the medical examiner was an agent of the State trying to secure a conviction. He pointed out that the medical examiner's conclusion was merely his opinion, and that the jury should apply its common sense. "[A]ll of you here have common sense, all of you. All of you understand bruising. All of you understand head wounds, all of you do. He gave you his opinion."

We conclude that Sontoya has not satisfied the "heavy burden" of persuasion that his substantial rights were affected by the disputed testimony. On this record, there is no reasonable likelihood that the disputed testimony had a significant effect on the jury's verdict. Therefore, we do not consider whether we "should address the error to ensure fairness and the integrity of the judicial proceedings." *See Griller*, 583 N.W.2d at 740.

## II.

Sontoya raises five issues in his pro se supplemental brief. First, Sontoya argues that his incriminating statements during the police interview were made under "false pretense[s]." Sontoya claims that he requested an attorney twice before his interview began and that he was intoxicated. Sontoya's alleged requests for an attorney, however, are not on the videotape of his interview. Moreover, Sontoya did not bring a motion before the district court to suppress his statement. Generally, we will not consider issues raised for the first time on appeal. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 584 n. 2 (Minn. 2010); *State v. Anderson*, 733 N.W.2d 128, 134 (Minn.2007); *State v. Kremer*, 307 Minn. 309, 312–13, 239 N.W.2d 476, 478 (1976) ("[T]he fundamental rule that this court will not decide issues which are raised for the first time on appeal has not been subject to an exception where the tardily raised errors consist of allegedly unconstitutional criminal procedures." (citation omitted)). We have, however, reserved the right in rare cases to examine a new issue as justice requires, provided it is not prejudicial to either party to do so. *See* Minn. R. Civ.App. P. 103.04; *Dykes*, 781 N.W.2d at 584 n. 2; *State v. Martin*,

---

"Were you able to determine what time [G.R.] died from bleeding out due to a sexual assault?"; and (3) "[Y]ou testified that the cause of [G.R.'s] death was bleeding out from her internal injuries from the sexual assault. Do you have an opinion as to how long it would have taken [G.R.] to bleed out?"

**3.** The three references were: (1) "[S]he bled to death from a sexual assault, as [the medical examiner] testified"; (2) "[The medical examiner] told you that she died from a sexual assault that caused her to bleed to death"; and (3) "You didn't need [the medical examiner] to tell you based on decades of experience doing autopsies that that was a sexual assault and that she bled to death from it."

773 N.W.2d 89, 97 n. 2 (Minn.2009). Sontoya has failed to establish extraordinary circumstances, and therefore we decline to reach this issue.

■■■■■ Second, Sontoya argues that the evidence presented to the grand jury was insufficient to establish probable cause to indict him for either first-or second-degree murder. Specifically, Sontoya argues that (1) other than the medical examiner's inadmissible testimony, the evidence failed to show that a sexual assault occurred and (2) there was no evidence of premeditation. Objections to an indictment must be made by motion no later than three days before the omnibus hearing. Minn. R.Crim. P. 10.04, subd. 1, and 17.06, subds. 2–3; *see also State v. Whittaker*, 568 N.W.2d 440, 448 (Minn.1997). Failure to do so constitutes a waiver. Minn. R.Crim. P. 10.03. We may grant relief from the waiver for good cause. *Whittaker*, 568 N.W.2d at 448. Sontoya has not identified any reasons that would constitute good cause. Thus, this issue is waived and we decline to address it. Further, "[a] presumption of regularity attaches to a grand jury indictment, and courts will rarely invalidate the indictment." *Id.* This is "especially true" where the defendant has been found guilty at a fair trial. *State v. Scruggs*, 421 N.W.2d 707, 717 (Minn.1988).

■■■■ Third, Sontoya argues that a family photograph of G.R. and her children introduced into evidence and displayed during the State's closing argument was unfairly prejudicial. The photograph was received into evidence without objection during "spark of life" testimony by G.R.'s father. Consequently, we review its admissibility for plain error. *See* Minn. R.Crim. P. 31.02; *Griller*, 583 N.W.2d at 740. No plain error occurred because a photograph is admissible to "show the 'spark of life' and to present the victim as a human being." *State v. Carney*, 649 N.W.2d 455, 463 (Minn.2002). Therefore, the district court did not abuse its discretion in admitting the photograph.

■■■ Fourth, Sontoya argues that two members of the jury were improperly contacted by other persons during the trial. He contends that the jurors were improperly influenced and therefore he is entitled to a new trial. A district court's decision that a juror can continue to be impartial after being exposed to information or private communications about the case outside of the trial proceedings is reviewed for an abuse of discretion. *See State v. Richards*, 552 N.W.2d 197, 210 (Minn. 1996); *State v. Cox*, 322 N.W.2d 555, 558 (Minn.1982).

■■■ In the first incident, an alternate juror, who was seated, overheard a conversation between two individuals outside the courtroom in which one person said to the other person "Oh, he is so guilty." The juror informed court personnel of the incident in the presence of the other jurors. Subsequently, the district court questioned all the jurors with the attorneys and Sontoya present. Based upon the jurors' responses, the attorneys for the parties indicated they were satisfied that the jurors were not influenced by the incident and could remain fair and impartial. In the second incident, a juror was asked by another person if the juror could discuss the case. The juror reported the incident to court personnel, and the court brought the incident to the attention of the parties. No concern was raised by either party that the juror was improperly influenced in any manner. The district court took no further action regarding either incident and impliedly concluded[4] that Sontoya had not

4. It would have been better had the district

court ruled Sontoya was not prejudiced or

been prejudiced or deprived of a fair trial. On this record, Sontoya has failed to establish that the district court abused its discretion, or that he was deprived of a fair trial.

▮▮ Fifth, Sontoya claims that the district court improperly reviewed reports before the trial began. The district court reviewed reports because there had been no pretrial motions, and the court wanted some familiarity with the issues likely to occur at trial. Sontoya argues that the reports contained hearsay evidence and irrelevant materials, and improperly influenced the district court's ruling on objections. But Sontoya does not cite either the record or legal authority to support this claim. Therefore, we decline to consider this issue on its merits.[5] *See State v. Tomassoni,* 778 N.W.2d 327, 335 (Minn. 2010) ("[T]his court does not consider pro se claims on appeal that are not supported by argument or citation to legal authority"); *State v. Bartylla,* 755 N.W.2d 8, 23 (Minn.2008) (noting that " '[a]n assignment of error based on mere assertion and not supported by any argument or authorities ... is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection' ") (quoting *Louden v. Louden,* 221 Minn. 338, 339, 22 N.W.2d 164, 166 (1946)).

Affirmed.

Concurring, ANDERSON, PAUL H. and PAGE, JJ.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I concur in the result reached by the majority and would affirm the conviction of appellant, Michael Carrasco Sontoya; but I write separately to emphasize my concern with respect to the content of the medical examiner's testimony. The court assumes that there was error, and it was plain, and then concludes that the assumed plain error did not affect Sontoya's substantial rights. I would not skip an analysis under the first two prongs and would conclude that there was error and it was plain. Moreover, I want to emphasize my position that how the court reached its conclusion on the third prong should not detract from the serious nature of the underlying error. The only reason I would affirm is because this is one of those cases where the evidence that Sontoya murdered G.R. while committing or attempting to commit criminal sexual conduct is so overwhelming, we should affirm despite the serious nature of the error.

The facts surrounding the murder of G.R. are horrible and paint a gruesome picture of how she spent the last hours of her life. The evidence that Sontoya was the perpetrator of the acts that ended G.R.'s life is overwhelming, as is the evidence that Sontoya murdered G.R. while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence in violation of Minn.Stat. § 609.185(a)(2) (2008). The district court's error in admitting the medical examiner's testimony regarding an element of the offense, which is to be determined by the jury, does not affect this result. Therefore, the jury's verdict that

---

deprived of a fair trial and explained its reasoning.

**5.** Were we to consider this issue on the merits, our "great confidence" in the ability of the

judge to "follow the law" would support rejection of the claim. *See State v. Burrell,* 772 N.W.2d 459, 467 (Minn.2009).

Sontoya is guilty should be affirmed. But as we affirm Sontoya's conviction I believe we can only do so in the context of a strong statement that testimony like that of the medical examiner is improper and will not be tolerated in the future.

Testimony on an ultimate issue—an element of the crime—is generally not objectionable if the testimony is helpful to the jury. *See* Minn. R. Evid. 704. But because the testimony of an expert witness has the potential to unduly influence a jury, we have said that "[s]pecial care must be taken by the trial judge to ensure that the defendant's presumption of innocence does not get lost in the flurry of expert testimony and, more importantly, that the responsibility for judging credibility and the facts remains with the jury." *State v. Grecinger*, 569 N.W.2d 189, 193 (Minn. 1997).

At Sontoya's trial, the last witness called by the State was the Ramsey County Medical Examiner who examined G.R.'s body at the crime scene and conducted the autopsy. During direct examination, the medical examiner testified that the cause of G.R.'s death was "exsanguinations due to multiple traumatic injuries *due to a sexual assault.*" The State followed this answer with a question about whether G.R. "bled to death from the sexual assault" and, in his answer, the medical examiner confirmed that she had. The medical examiner then testified that the manner of death was "homicide." The State continued to question the medical examiner as to whether he could determine G.R.'s time of death due to the "sexual assault." During this questioning, the medical examiner testified that the contusions on G.R.'s arms were "fingerprint injuries" which occur when someone is grabbed "during the course of an assault." Finally, the State used the medical examiner's expert testimony in its closing argument when it made the following assertions:

> As I said, we know that G.R. died a horrific death. She bled to death from *a sexual assault,* as the medical examiner has testified.
>
> The medical examiner testified that G.R. died as a result of bleeding to death from *a sexual assault.* That, Ladies and Gentlemen, is Murder in the First Degree.
>
> The medical examiner told you that she died from *a sexual assault* that caused her to bleed to death.

(Emphasis added.)

To be admissible, expert testimony should add "precision or depth to the jury's ability to reach conclusions about matters that are not within its experience." *State v. DeShay,* 669 N.W.2d 878, 888 (Minn.2003). The basic consideration in deciding whether to admit expert testimony is whether the testimony will help the jury in resolving factual questions. *Grecinger,* 569 N.W.2d at 195. To be "helpful," expert testimony should "explain a phenomenon not within the understanding of an ordinary lay person." *State v. Hennum,* 441 N.W.2d 793, 798 (Minn.1989). Expert testimony is not helpful if "the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience...." *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980).

Under the helpfulness test, we have consistently "not allowed ultimate conclusion testimony which embraces legal conclusions or terms of art." *State v. DeWald,* 463 N.W.2d 741, 744 (Minn.1990); *see also* Minn. R. Evid. 704 comm. cmt.–1977 (stating that expert testimony involving legal analysis or mixed questions of law and fact

is not helpful to the trier of fact). This rule is necessary because opinions involving a legal analysis or mixed questions of law and fact are of no use to the trier of fact. *State v. Chambers*, 507 N.W.2d 237, 238 (Minn.1993); *see also State v. Lopez–Rios*, 669 N.W.2d 603, 613 (Minn.2003) ("[W]hile the evidentiary rules do not bar all expert testimony concerning the ultimate issue, a district court may exclude ultimate issue testimony . . . when the testimony would merely tell the jury what result to reach.").

We have in the past stated that admission of a physician's opinion that rape or sexual assault occurred constitutes error. For example, in *State v. Saldana*, the defendant was charged with first-degree criminal sexual conduct. 324 N.W.2d 227, 229 (Minn.1982). At trial, the defendant admitted to having had sexual intercourse with the alleged victim but claimed that the sexual activity was consensual. *Id.* To rebut the defendant's claim, the State offered the testimony of an expert witness, who stated that the alleged victim was in fact sexually assaulted and raped. The defendant appealed his conviction and on appeal, we adopted the majority rule of other courts that "admission of a physician's opinion that rape or sexual assault had occurred is error." *Id.* at 231. We concluded that jurors were capable of considering the admissible evidence and determining whether a rape occurred and that the expert testimony was not helpful to the jury. *Id.* We went on to say that the expert testimony was a legal conclusion, "which was of no use to the jury." *Id.* We then held that the erroneous admission of the physician's testimony was reversible error and remanded the case for a new trial. *Id.* at 232.

More recently, in *State v. Moore*, the defendant was charged with first-degree assault. 699 N.W.2d 733, 735 (Minn.2005). At trial, the State's expert witness, the treating physician, testified that the victim's injuries met the legal definition of "great bodily harm," an element of the charged offense and the defendant was convicted. *Id.* at 736. On appeal, we held that the expert testimony of the physician was improper and inadmissible, because it constituted a legal conclusion on an element of the charged offense and merely told the jury what result to reach. *Id.* at 740. We reasoned that the jury was equally capable of determining whether the victim suffered great bodily harm and that the expert testimony did not add precision or depth to the jury's ability to reach a conclusion on the question. *Id.* We found reversible error and remanded for a new trial. *Id.*

Here, the medical examiner's testimony that G.R. was sexually assaulted was a legal conclusion on a key element of the crime with which Sontoya was charged. The testimony was not helpful to the jury; rather, it told the jury that the sexual assault element of the charged first-degree murder offense had been proved by the State.[1] Consequently, the expert testimony impermissibly intruded upon the jury's "responsibility for judging credibility and the facts." *Grecinger*, 569 N.W.2d at 193. The jury was capable of determining whether G.R. was sexually assaulted and the expert testimony did not add precision or depth to the jury's ability to reach its own conclusion.

Further, it should be noted that Sontoya is not suggesting that the medical examiner could not have testified as to the cause and manner of G.R.'s death. For example, in *Chambers*, we summarized the proper

---

1. *See* Minn.Stat. § 609.185(a)(2); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice–* *Jury Instruction Guides, Criminal,* CRIMJIG 11.07 (5th ed.2006).

scope of a pathologist's testimony in a murder case as follows:

> A pathologist may appropriately testify to things such as the number and extent of the wounds, the amount of bleeding, whether the wounds were caused by a knife or a blunt instrument, whether a gunshot wound is a contact wound, whether the wounds could or could not have been the result of accident, the cause of death, and so forth, but the pathologist should not be allowed to make an "expert inference" of intent to kill from these matters. That is for the jury to do.

*Chambers*, 507 N.W.2d at 239.

To be consistent with our case law, I believe we must conclude that the medical examiner's testimony that G.R. was sexually assaulted, an element of the charged first-degree murder offense, was inadmissible expert testimony and should have been excluded. Further, I conclude that an error of this nature affects substantial rights if it is prejudicial and affects the outcome of the case. *State v. Ihle*, 640 N.W.2d 910, 917 (Minn.2002). We have held that an error affects substantial rights when there is a reasonable likelihood that the absence of the error would have had a significant effect on the jury's verdict. *State v. Reed*, 737 N.W.2d 572, 583 (Minn.2007).

In order to convict Sontoya on the charged offense, the State was required to prove beyond a reasonable doubt that he committed a sexual assault against G.R. when he murdered her. Sontoya's defense at trial was that he did not sexually assault G.R. The key disputed issue for the jury to decide was whether a sexual assault occurred. The medical examiner's testimony that G.R. was sexually assaulted was the only direct evidence presented by the State that a sexual assault occurred. In essence, the medical examiner told the jury what result to reach on the only con-

tested element of the charged offense. At the same time, the testimony unfairly prejudiced Sontoya's consent defense. Moreover, the medical examiner's improper expert testimony was presented in a manner that could not have been lost on the jury. Expert testimony by its very nature has a potential to unduly influence a jury. The medical examiner was also the last witness the jury heard before it retired to deliberate which meant Sontoya had no way in which to counter the medical examiner's testimony.

Under most similar circumstances, we would have no alternative other than to conclude that the plain error committed by the admission of the medical examiner's testimony affected Sontoya's substantial rights and that affected the ultimate outcome in the case. Nevertheless, I conclude that this is one of those plain error cases where because of the overwhelming evidence of Sontoya's guilt, we should affirm the jury's verdict and the conviction.

PAGE, Justice, (concurring).

I join in the concurrence of Justice Paul H. Anderson.