STATE of Minnesota, Respondent,

v.

Myon Demarlo BURRELL, Appellant.

No. A08–1271.

Supreme Court of Minnesota.

Aug. 20, 2009.

Rehearing Denied Oct. 5, 2009.

Lori Swanson, Minnesota Attorney General, St. Paul, MN, and; Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

Appellant Myon Demarlo Burrell was twice convicted of first-degree murder and attempted first-degree murder and sentenced to life in prison for the shooting death of Tyesha Edwards, an 11–year–old girl who was struck and killed by a stray bullet in her south Minneapolis home. On appeal from his second trial, Burrell challenges his conviction and sentence, arguing that the district court erred in (1) admitting evidence of prior bad acts, (2) admitting the testimony of a gang expert, (3) admitting the grand jury testimony of a deceased witness, and (4) imposing a harsher sentence than the sentence Burrell received after his first trial. We affirm in part, reverse in part, and remand.

On November 22, 2002, Timothy Oliver was standing in the front yard of his aunt's house in south Minneapolis. Oliver belonged to a gang known as the Gangster Disciples. At approximately 3 p.m., a maroon Chevy Malibu drove toward the house where Oliver was standing. Oliver believed the car belonged to "Hans," who

belonged to a rival gang, the Bloods. Oliver observed a man. he knew as "Ike" driving the car, and a man whom Oliver knew as "Little Skits" riding in the front passenger seat. Oliver testified that he and Ike "mean-mugged" each other before the car sped away.

Minutes later, Oliver was standing on the front porch of his aunt's house when he heard gunshots from across the street. Oliver testified that he heard nine to ten gunshots and then ran to the side of the house. After the shooting ceased, Oliver returned to the front of the house and looked across the street. Oliver testified that he saw Little Skits standing between two houses, pointing a gun at him and pulling the trigger. Oliver further testified that he was not harmed in the shooting but his pants had a bullet hole in them.

Shortly after 3 p.m. on November 22, police responded to a report of a shooting at the house next door to Oliver's aunt's home. When the police arrived, they found Tyesha Edwards lying on the dining room floor of her home. Edwards had been struck in the chest and killed by a .40 caliber bullet that had penetrated the wall of her home.

The police recovered seven .40 caliber shell casings on the ground across the street from Edwards' and Oliver's aunt's houses. All seven shell casings were fired from the same gun.

On November 25, 2002, the police arrested Oliver. Oliver told the police that Little Skits had shot at him, but that he did not know Little Skits' real name. Oliver correctly identified photos of Ike Tyson and Hans Williams. Oliver also identified a photo of appellant Myon Burrell as Little Skits.

Later on November 25, the police arrested Tyson and Williams. Tyson told the police that Little Skits often stayed in Bemidji. When the police contacted the authorities in Bemidji, they learned that Little Skits was 16–year–old Myon Burrell. Tyson identified photos of Burrell as Little Skits. The police arrested Burrell on November 26, 2002.

A Hennepin County grand jury indicted Burrell on eight counts: premeditated first-degree murder, Minn.Stat. § 609.185(a)(1) (2008); premeditated first-degree murder committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2 (2008); first-degree murder committed during a drive-by shooting, Minn.Stat. § 609.185(a)(3); first-degree murder committed during a drive-by shooting and committed for the benefit of a gang, Minn. Stat. § 609.229, subd. 2; attempted premeditated first-degree murder, Minn.Stat. § 609.185(a)(1); attempted premeditated first-degree murder committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2; attempted first-degree murder committed during a drive-by shooting, Minn.Stat. § 609.185(a)(3); and attempted first-degree murder committed during a drive-by shooting and committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2.

After a jury trial before Hennepin County District Court Judge Steven A. Pihlaja, Burrell was found guilty as charged and sentenced to life in prison plus 198 months. On direct appeal, we reversed Burrell's convictions and remanded for a new trial on the grounds that (1) Burrell's *Miranda* waiver was ineffective, (2) expert testimony vouching for a witness's credibility was error, and (3) the district court erred by refusing to compel discovery of the State's plea negotiations with Burrell's codefendants. *State v. Burrell,* 697 N.W.2d 579, 597, 601, 605 (Minn.2005).

On remand, Burrell's case was reassigned to Hennepin County District Court Judge Charles A. Porter. The State pur-

sued the same eight charges handed up by the grand jury and tried at Burrell's first trial. Before the second trial, over Burrell's objection, the district court issued an order admitting prior bad act and gang-related evidence.[1]

At Burrell's second trial, the State elicited the following evidence implicating Burrell in the shooting. Esque Dickerson, a friend of Burrell's, testified that she spoke with Burrell shortly after his arrest. She admitted that she told her boyfriend that Burrell told her he was present at the "shooting [where] that little girl got killed." Dickerson also told her boyfriend that Burrell said that he and Tyson were in a red car, the model of which began with an "M."

James Turner was housed in a jail cell adjacent to Burrell's while Burrell was awaiting trial. According to Turner, Burrell admitted to him that he was in jail because he had shot someone. Turner claimed that Burrell stated that he was shooting at a rival gang member but shot and killed "the little girl." Defense counsel impeached Turner with evidence that he is a paranoid-schizophrenic sex-offender who suffers from hallucinations.

Dameon Leake is a member of the Rolling 60s Crips, a rival gang to the Gangster Disciples. Leake was a friend of Oliver's. According to Leake, while in jail, Burrell told him that he was "trying to smoke Little Timmy" when the "little girl" got killed. Defense counsel impeached Leake, arguing that Leake was hoping to receive a downward departure on an unrelated drug charge in exchange for his testimony.

Terry Arrington is a member of the Black Stones, a gang which is affiliated with the Family Mob. Arrington testified that Burrell told him in jail that the bullet that hit Edwards went through "your boy" before it hit the house. Defense counsel elicited testimony on cross-examination that Arrington could reduce his own prison sentence by testifying against Burrell and others.

Kiron Williams is a member of the Family Mob. He testified that while in jail in 2005, he accused Burrell of "killing kids." According to Williams, Burrell responded that the intended target was Williams' "homeboy." Williams interpreted this to refer to Oliver. Burrell's defense counsel elicited testimony from Williams that he received a downward departure on his sentence for testifying against Burrell and others.

The State also introduced several incidents of Burrell's prior bad acts, pursuant to the district court's pre-trial ruling.

During Leake's testimony, he claimed that in 2002, Burrell shot at him and three other men as they stood on the corner of Portland and Franklin in south Minne-

1. Prior to Burrell's second trial, Judge Porter ruled on a number of pretrial motions, two of which resulted in lengthy appellate review. The State made a motion to admit the expert testimony of police officers who specialized in criminal gangs. The district court denied the State's motion, but certified the question as important and doubtful, warranting interlocutory review. *See* Minn. R.Crim. P. 28.03. The court of appeals dismissed the State's appeal and we denied further review. *State v. Burrell,* No. A06–149, 2006 WL 2807166, at *5 (Minn.App. Oct. 3, 2006), *rev. denied* (Minn. Dec. 20, 2006).

On March 26, 2007, the district court accepted Burrell's waiver of his right to a jury trial. Believing Judge Porter had made statements prejudicial to its case, the State requested that Judge Porter recuse himself. Judge Porter declined to recuse himself. The State petitioned the court of appeals for a writ of mandamus directing Porter's removal from the case. The court of appeals denied the State's petition and we affirmed. *State v. Burrell,* 743 N.W.2d 596, 598 (Minn.2008).

apolis. Leake stated that Burrell yelled "Rolling 30s Bloods gang" while shooting. No one was hurt in the incident.

Arrington testified that at some point before the Edwards shooting, Burrell shot from a car at Arrington, Oliver, and two other men as the men sat in Peavey Park in south Minneapolis. Arrington testified that Burrell wore a red rag on his hand and said "What up; Blood." as he fired.

Deleon Walker, who was friends with Oliver and other members of the Family Mob and Gangster Disciples, testified that Burrell shot at him on November 25, 2002. Walker said that Burrell and another man walked past him and others in front of a Lake Street coffeehouse in south Minneapolis. According to Walker, Burrell shot at him, missed, and hit a Somali man.

Brady Bell is Burrell's ex-girlfriend. She testified that at some point in 2000, Burrell shot at a car. According to Bell, she, Burrell, and two others were walking on a sidewalk. When a suspicious car approached the group, Bell became nervous that the occupants of the car would open fire on the group. Bell stated that she did not know who was in the car, but testified that the occupants of the car fired shots at the group and that Burrell shot at the car.

During Burrell's second trial, the State called Isaac Hodge as its primary gang expert. Hodge has been a gang member since 1992, and described himself as the leader of the Family Mob beginning 1996. Hodge testified generally about the culture, colors, and territory of the Rolling 30s Bloods. Hodge stated that Bloods commit crimes, including drive-by shootings and drug sales. Hodge also described the violent rivalry between the Family Mob and the Bloods. Hodge stated that in gang culture, "[r]etaliation is a must." Hodge also testified that when someone joins a gang, that person is expected to

"earn his stripes." According to Hodge, a gang member earns his stripes by becoming a rider, a person whose job is to ride around in vehicles and shoot at members of rival gangs. Hodge testified that Oliver was a rider and that Oliver had "shot the most Bloods out of everybody in our whole neighborhood." Hodge also claimed that some "older Bloods" had told him that a standing order existed among the Bloods to "blast [Oliver] on sight." Hodge gave his opinion that killing Oliver would have earned stripes for a young Blood. Finally, Hodge testified that it was common for gang members to "take" a case for a fellow gang member, meaning one gang member will take the fall for a crime committed by another, and that gang members do not cooperate with the police.

Between Burrell's first and second trials, Oliver was killed. In a pretrial ruling, the district court ruled that Oliver's testimony from Burrell's first trial was admissible as substantive evidence and that Oliver's testimony before the grand jury was admissible only to the extent necessary to impeach his trial testimony.

At the conclusion of Burrell's second trial, the district court found Burrell guilty of premeditated first-degree murder, Minn.Stat. § 609.185(a)(1); premeditated first-degree murder committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2; attempted premeditated first-degree murder, Minn.Stat. § 609.185(a)(1); and attempted premeditated first-degree murder committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2. The district court found Burrell not guilty of the four counts relating to committing a crime in the course of a drive-by shooting. The court entered a judgment of conviction for premeditated first-degree murder committed for the benefit of a gang, and attempted premeditated first-degree murder committed for the benefit of a gang. The

court sentenced Burrell to life plus 60 months in prison for the first conviction and to a consecutive term of 186 months in prison for the second conviction.

Burrell appealed his conviction and sentence.

## I.

Burrell argues that the district court erred in admitting evidence of four prior shooting incidents. We review a district court's evidentiary rulings for abuse of discretion. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998). A defendant appealing the admission of evidence has the burden to show it was erroneous and prejudicial. *Id.*

Generally, evidence is admissible only if it is relevant. Minn. R. Evid. 402. Evidence of a defendant's other crimes or bad acts is not admissible to prove the defendant's character for committing crimes. Minn. R. Evid. 404(b). Such evidence, often referred to as *Spreigl* evidence, may be admissible to show motive, intent, absence of mistake, identity, or a common scheme or plan. *State v. Gomez*, 721 N.W.2d 871, 877 (Minn.2006); *see State v. Spreigl*, 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965); Minn. R. Evid. 404(b).

For *Spreigl* evidence to be admissible, the State must first provide notice of its intent to use the evidence. *State v. Ness*, 707 N.W.2d 676, 686 (Minn.2006). The State must also clearly indicate what the evidence is being offered to prove. *Id.* In addition, there must be clear and convincing evidence that the defendant was involved in the other crime or bad act, the evidence must be relevant and material to the State's case, and the probative value of the evidence must not be outweighed by the potential for unfair prejudice to the defendant. *Id.* If it is "a close call"

whether the evidence should be admitted, the trial court should exclude it. *Id.* at 685.

In this case, the district court ruled that Burrell's prior bad acts were relevant and material to Burrell's motive, and that the probative value of the evidence was not outweighed by the risk of unfair prejudice to Burrell. The court relied extensively on our decision in *State v. Ness*, 707 N.W.2d 676 (Minn.2006), where we stated that "[m]otive is not an element of most crimes, but the state is usually entitled to prove motive because 'motive explains the reason for an act and can be important to a required state of mind.'" *Id.* at 687 (citing 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice–Criminal Law and Procedure* § 32.19 at 451 (3d ed. 2001)). The court also found that although admitting the evidence of the bad acts created a risk of unfair prejudice to Burrell, the prior acts would be "highly probative" of Burrell's motive, "why a person would have been at the scene," and the "nature of the relationship between the Bloods gang" and Oliver.

Burrell concedes that Minn. R. Evid. 404(b) allows for the admission of prior bad acts showing motive. But, according to Burrell, the only facts relevant to showing that the motive for the crime was gang retaliation were: (1) Burrell's membership in the Bloods, (2) Oliver's membership in the Family Mob, and (3) the ongoing rivalry between the two gangs. The prior acts of shooting at Leake, Arrington, Walker, or Oliver did not provide the "reason for [the] act" of shooting at Oliver, according to Burrell. Thus, according to Burrell, his prior bad acts were not relevant and material to the State's case, and the probative value of the evidence was outweighed by the potential for unfair prejudice.

Burrell cites a handful of cases for the proposition that in order for a prior bad

act to demonstrate motive, the prior act must show a clear, non propensity-based motive theory for why the defendant committed the prior bad acts: "if not for the bad acts, the defendant would have had no reason to commit the charged offense." *See State v. Kendell,* 723 N.W.2d 597, 608 n. 8 (Minn.2006) (holding that evidence of prior murder was admissible to prove motive for a defendant who subsequently killed a witness to the original murder); *State v. Ferguson,* 581 N.W.2d 824, 834 (Minn.1998) (holding graffiti evidence admissible to show that gang affiliation was motive for murder was proper); *State v. Nunn,* 561 N.W.2d 902, 907–08 (Minn. 1997) (holding prior kidnapping conviction admissible where kidnapping victim told the defendant that the subsequent murder victim had stolen drugs and money from the defendant); *State v. Scruggs,* 421 N.W.2d 707, 715 (Minn.1988) (approving the admission of prior bad acts where State proved that the defendant killed the witness to prevent the witness from providing the police with information regarding the defendant's involvement in the crime).

Burrell also relies on *State v. Ness,* 707 N.W.2d 676 (Minn.2006). In *Ness,* we held that a prior sex offense was not relevant to show the defendant's motive for committing a subsequent child sex abuse crime. *Id.* at 687. We said that Ness' motive for committing the subsequent crime was a desire for sexual gratification—not the commission of a prior sex crime. *Id.*

In defending the district court' order allowing the evidence of Burrell's prior bad acts, the State relies heavily on *Ferguson,* 581 N.W.2d at 834. As noted, *Ferguson* upheld the admission of prior gang graffiti to show that the defendant's gang affiliation was the motive for the charged crime. *Id.* Here, according to the State,

the prior bad acts are "even more compelling."

■ We reject Burrell's argument. As a threshold matter, we do not agree that a prior bad act must provide the but-for reason for committing the charged offense. The touchstone of the inquiry is simply an evaluation of whether the evidence is material and relevant and whether the probative value of the evidence weighed against the potential for unfair prejudice. In cases where the prior bad act provides a clear motive for committing the charged offense, *see, e.g., State v. Scruggs,* 421 N.W.2d 707, 715 (Minn.1988), the evidence could be characterized as highly probative. In such a case, the likelihood that the risk of unfair prejudice outweighs the probative value of the evidence is diminished.

■ Here, although the value of Burrell's prior bad acts is not overwhelming, we cannot say that these prior shooting incidents are irrelevant or immaterial to Burrell's motive. Rather, the prior shooting incidents shed light on why Burrell shot at Oliver on November 22, 2002. The pattern of shooting incidents shows a young man caught up in a violent rivalry with another street gang. This rivalry, illustrated by the prior shooting incidents, helps explain why Burrell would have shot at Oliver.

■ Having concluded that the prior shootings are probative of Burrell's motive, we must next examine whether the probative value of the evidence was outweighed by the risk of unfair prejudice to Burrell. The evidence offered by the State was prejudicial. The evidence, although relevant to Burrell's motive, could also be used improperly to establish that Burrell has a propensity for committing violent crimes. In addition, the evidence could distort the integrity of the fact-find-

ing process by appealing to emotion and passion over reason.

█ In Burrell's second trial, however, the evidence was presented to Judge Porter, and not to a jury. The distinction between a jury trial and a bench trial is important. The risk of unfair prejudice to Burrell is reduced because there is comparatively less risk that the district court judge, as compared to a jury of laypersons, would use the evidence for an improper purpose or have his sense of reason overcome by emotion. *Cf. Schultz v. Butcher,* 24 F.3d 626, 631–32 (4th Cir.1994) (holding that evidence should not have been excluded from a bench trial on the grounds of unfair prejudice); *United States v. J.H.H.,* 22 F.3d 821, 829 (8th Cir.1994) ("[I]n a bench trial the prejudicial impact of erroneously admitted evidence, if any error there may be, 'is presumed to be substantially less than it might have been in a jury trial'") (quoting *United States v. Cardenas,* 9 F.3d 1139, 1156 (5th Cir.1993)). Indeed, excluding relevant evidence at a bench trial on the grounds of unfair prejudice "is in a sense ridiculous." 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 4:13, at 655 (3d ed. 2007). After all, it is the district court judge who is called upon in the first instance to rule on the admissibility of the evidence. This is not to suggest that judges are immune from emotional appeals or the temptation to misuse evidence—they are not. But, taking into account the district court judge's experience and familiarity with the operation of the rules of evidence, the risk of unfair prejudice is lessened. *Cf. State v. Sailer,* 587 N.W.2d 756, 764 (Iowa 1998) (stating that a reviewing court should place "great confidence" in judges' ability to follow the law and should not assume that evidence was considered for an improper purpose without a clear showing).

While the probative value of Burrell's prior shooting incidents is not great, the risk of unfair prejudice to Burrell in the context of a bench trial is similarly small. Therefore, we conclude that the district court acted within its discretion in admitting the evidence of Burrell's prior bad acts.

**II.**

█ Burrell next argues that the district court erred in admitting the expert testimony of Isaac Hodge as the State's "primary gang expert," and that this error was not harmless.

█ Minnesota Rules of Evidence 702 allows expert testimony if the testimony will assist the jury in evaluating evidence or resolving factual issues. *State v. Grecinger,* 569 N.W.2d 189, 195 (Minn. 1997). The admissibility of expert testimony generally rests within the sound discretion of the district court. *State v. Lopez–Rios,* 669 N.W.2d 603, 613 (Minn.2003); *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995). The district court's decision on whether to admit expert testimony is reviewed for a clear abuse of discretion. *State v. Ritt,* 599 N.W.2d 802, 810 (Minn. 1999).

In *State v. DeShay* and in *Lopez–Rios,* we stated that gang-expert testimony should be admitted only if it is helpful to the jury in making the specific factual determinations that jurors are required to make. *State v. DeShay,* 669 N.W.2d 878, 884 (Minn.2003); *Lopez–Rios,* 669 N.W.2d at 613. We added that, in order to be admissible, gang-expert testimony must

add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience. Moreover, this testimony must be carefully monitored by the [district] court so that the testimony will not unduly influ-

ence the jury or dissuade it from exercising its independent judgment. Even if acceptable under Rule 702, expert testimony should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

*DeShay,* 669 N.W.2d at 888 (citing Minn. R. Evid. 403).

In *DeShay* and *Lopez–Rios,* we held that the admission of expert testimony on general gang activities and gang affiliation was error. *DeShay,* 669 N.W.2d at 888; *Lopez–Rios,* 669 N.W.2d at 613. In *DeShay,* we held that much of the gang expert's testimony was admitted erroneously because the testimony was duplicative of other lay testimony, giving little assistance to the jury in evaluating the evidence. 669 N.W.2d at 888. In *Lopez–Rios,* we held that much of the gang expert's testimony on general gang activities and gang affiliation was similarly erroneously admitted as the testimony was duplicative of previous witness testimony. 669 N.W.2d at 612–13. We also expressed our concern over the expert's testimony that the defendant was a member of a criminal gang. *Id.* In addition, we cautioned that expert testimony should not be used as a means to launder otherwise inadmissible hearsay. *DeShay,* 669 N.W.2d at 886. Despite our concerns, in both cases, we concluded that any error in admitting the evidence was harmless because the key facts—the defendant's involvement in a gang and the rivalry between two rival gangs—was thoroughly proved by other competent evidence. *Id.* at 888; *Lopez–Rios,* 669 N.W.2d at 612–14. *See also State v. Blanche,* 696 N.W.2d 351, 362, 374 (Minn. 2005) (disapproving of gang expert testimony that gang members sho[o]t at each other, gang members have to retaliate, and that gang members are not cooperative with the police.).

We have not always rejected gang expert testimony. In *State v. Jackson,* 714 N.W.2d 681 (Minn.2006), we upheld the admission of certain aspects of the State's gang expert's testimony. In *Jackson,* the State's gang expert testified about the Bloods gang generally, discussing the gang's identifying hand signs and colors and the criminal activities in which Bloods gang members are involved. The expert also testified about the role of respect in Bloods culture. In addition, he stated that the defendant was associated with the Bloods gang and that, in his opinion, the victim was "murdered for the sake of the Bloods, [for] showing disrespect." *Id.* at 692.

We held that the expert's testimony "about the general criminal activities of Bloods gang members was admissible because it assisted the jury in deciding whether the commission of crimes is one of the primary activities of the Bloods gang, a prerequisite for proving that the Bloods gang meets the statutory definition of a 'criminal gang'" under Minn.Stat. § 609.229. *Id.* Further, we held that the testimony was helpful in proving motive and neither "belabored nor excessive," *id.,* and noted that none of the expert's testimony relied on otherwise inadmissible hearsay. *Id.* at 692–93.

Burrell contends that the district court erroneously admitted Hodge's testimony that "[r]etaliation is a must," that gang members are expected to "earn their stripes," do not cooperate with the police, and commit crimes, including drive-by shootings and drug sales. In addition, Burrell argues that Hodge's statement that a gang member will take a case for another gang member was inadmissible because it potentially vouched for the veracity of certain witnesses. Finally, Burrell argues that Hodge's testimony that "a couple [of] older Bloods" told him that an

order had gone out to kill Oliver was inadmissible hearsay. *See DeShay,* 669 N.W.2d at 886.

We assume, without deciding that Burrell is correct in his assertion, that portions of Hodge's testimony were inadmissible under *DeShay, Lopez–Rios,* and *Blanche.* However, at Burrell's trial, it was largely uncontested that the Bloods and the Family Mob were engaged in a violent rivalry, and that Burrell and Oliver were gang members. Instead, Burrell took the position at trial that he was not the shooter. Given that the identity of the shooter was the primary contested issue at trial, the potential prejudicial effect of Hodge's expert testimony is lessened. Because none of Hodge's testimony directly implicated Burrell as the shooter, we conclude that the admission of Hodge's expert testimony, if error, was harmless beyond a reasonable doubt.

### III.

■ Burrell argues that the district court committed reversible error by including in its findings of fact two facts drawn from Oliver's grand jury testimony: (1) testimony that Burrell was a member of the Bloods gang, and (2) testimony that Burrell was the shooter. Burrell alleges that this testimony is inadmissible hearsay. As previously discussed, in a pretrial ruling, the district court ruled that Oliver's testimony from Burrell's first trial was admissible as substantive evidence and that Oliver's testimony before the grand jury was admissible only to the extent necessary to impeach his trial testimony.

■ A statement is hearsay if it was made outside of court and is offered in evidence to prove what it asserts. Minn. R. Evid. 801(c). Evidentiary rulings on hearsay statements are reviewed for clear abuse of discretion. *State v. Henderson,* 620 N.W.2d 688, 696 (Minn.2001).

Burrell asserts that the district court violated its own pretrial ruling when it made the factual finding that "Oliver[ ] testified that he knew Skits was a member of the Bloods gang," because the testimony came from Oliver's grand jury testimony and not from Oliver's testimony at Burrell's first trial. Burrell makes the same objection to Oliver's grand jury testimony identifying Burrell as the shooter.

We reject Burrell's argument that the admission of the grand jury testimony prejudiced him. First, there was no dispute that Burrell was a member of the Bloods, as five witnesses testified to this point at Burrell's trial. Further, Oliver testified at Burrell's first trial that the shooter was Little Skits, and correctly identified a photo of Burrell as Little Skits. Therefore, to the extent that the district court relied on Oliver's grand jury testimony as substantive evidence, Burrell's claim that he was prejudiced fails.

### IV.

■ Finally, Burrell argues that the district court erred in imposing a longer sentence than the sentence imposed following Burrell's first trial. After his first trial, Burrell received a sentence of life plus 12 months in prison for committing first-degree murder. After his second conviction, the district court sentenced Burrell to life plus 60 months in prison for committing first-degree murder.

■ The longer sentence is unlawful under *State v. Holmes,* 281 Minn. 294, 296, 161 N.W.2d 650, 652 (1968). As a matter of judicial policy in Minnesota, "a court cannot 'impose on a defendant who has secured a new trial a sentence more onerous than the one he initially received.'" *Hankerson v. State,* 723 N.W.2d 232, 241 (Minn.2006) (quoting *State v. Holmes,* 281 Minn. 294, 296, 161 N.W.2d 650, 652

(1968)). *See also State v. Jackson,* 749 N.W.2d 353, 358 (Minn.2008).

The State concedes that Burrell's sentence violates the rule we adopted in *Holmes.* We therefore vacate Burrell's sentence for his first-degree murder conviction, and remand for resentencing with instructions to the district court to impose a sentence of no longer than life plus 12 months for Burrell's first-degree murder conviction.

Affirmed in part, reversed in part, and remanded.