STATE OF MINNESOTA

IN SUPREME COURT

A13-1769

Hennepin County

Anderson, J.
Took no part, Gildea, C.J.

Myon Demarlo Burrell,

Appellant,

vs.

Filed: February 4, 2015
Office of Appellate Courts

State of Minnesota,

Respondent.

_____

Daniel S. Adkins, The Adkins Law Group, Chartered; and

Mark J. Miller, Mark J. Miller, P.A., Minneapolis, Minnesota, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

_____

1.    The postconviction court did not abuse its discretion when it denied appellant's request for a new trial after an evidentiary hearing, when it refused to compel the appearances of favorable witnesses at the evidentiary hearing, and when it excluded the cumulative testimony of a proposed witness.

2.    Appellant's claim of ineffective assistance of trial counsel fails as a matter of law.

Affirmed in part, and remanded for sentencing as directed.

Considered and decided by the court without oral argument.

O P I N I O N

ANDERSON, Justice.

Appellant Myon Demarlo Burrell was convicted of premeditated first-degree murder and attempted premeditated first-degree murder for the 2002 shooting death of 11-year-old Tyesha Edwards and the attempted murder of Timothy Oliver.  In this postconviction appeal, Burrell argues that he is entitled to a new trial primarily based on newly discovered evidence and the recantation of two witnesses.  After granting multiple continuances for Burrell to attempt to secure the appearance of favorable witnesses and then holding an evidentiary hearing, the postconviction court denied his petition.  On appeal, Burrell argues that the court abused its discretion when it failed to compel the appearances of favorable witnesses.  He also challenges the effectiveness of his trial counsel and the legality of the sentence imposed after a remand from his direct appeal. Because we conclude that (1) the postconviction court did not abuse its discretion when it refused to compel the appearance of witnesses at an evidentiary hearing, and (2) Burrell

2

forfeited his ineffective-assistance-of-counsel argument, we affirm on the merits. Because the sentence was improper, we remand for resentencing consistent with our direction in *State v. Burrell* (*Burrell II*), 772 N.W.2d 459 (Minn. 2009).

I.

Burrell originally was convicted of four counts of attempted first-degree murder in Oliver's shooting and four counts of first-degree murder for Edwards's 2002 death, and sentenced to life in prison. We reversed and remanded. *State v. Burrell* (*Burrell I*), 697 N.W.2d 579 (Minn. 2005). On remand, following a bench trial, Burrell was acquitted of four of the counts, but convicted again of two counts of murder and two counts of attempted murder. We affirmed the convictions on direct appeal, but remanded to correct Burrell's sentence, holding that the district court in the second trial erred in imposing a longer sentence than that imposed in Burrell's first trial. *Burrell II*, 772 N.W.2d at 469-470.

The facts underlying Burrell's convictions are set forth in detail in *Burrell II*, 772 N.W.2d at 461-65, so we only briefly recount them here. On November 22, 2002, Tyesha Edwards, whose family lived next door to the aunt of Gangsters Disciple gang member Timothy Oliver, was killed by a stray bullet that pierced the wall of her family's South Minneapolis home and struck her in the chest. *Id.* at 461-62. At Burrell's first trial, Oliver testified that on the day of the murder he saw a maroon car that he believed belonged to rival gang member Hans Williams drive toward his aunt's house. *Id.* A man he knew as "Ike" was driving the car, and a man he knew as "Little Skits" was in the front passenger seat. *Id.* at 462. Oliver also testified that he heard nine or ten gunshots

3

minutes after observing the car, and that he saw Little Skits standing between two houses, pointing a gun at him and pulling the trigger. *Id.* When police responded to calls from Edwards's house, they found Edwards lying on the dining room floor, having been killed by a .40 caliber bullet. *Id.* Oliver later identified photos of Isaiah "Ike" Tyson as having been in the maroon car, and Burrell as Little Skits, the shooter. *Id.*

A Hennepin County jury found Burrell guilty of four counts of first-degree murder, Minn. Stat. §§ 609.185(a)(1), (3); 609.229, subd. 2 (2014) (premeditated murder, premeditated murder for the benefit of a gang, intentional drive-by murder, and intentional drive-by murder for the benefit of a gang); and, four counts of attempted first-degree murder, Minn. Stat. §§ 609.185(a)(1), (3); 609.229, subd. 2 (attempted premeditated murder, attempted premeditated murder for the benefit of a gang, attempted intentional drive-by murder, and attempted intentional drive-by murder for the benefit of a gang). The district court convicted Burrell of two of the eight counts and sentenced him to life in prison plus 12 months for first-degree murder for the benefit of a gang and to a consecutive 186-month term for attempted first-degree murder for the benefit of a gang.

On Burrell's direct appeal, we reversed and remanded for a new trial on the grounds that (1) Burrell's *Miranda* waiver was ineffective, (2) the admission of expert testimony vouching for a witness's credibility was error, and (3) the district court erred when it refused to compel discovery of the State's plea negotiations with Burrell's codefendants. *Burrell I*, 697 N.W.2d at 597, 601, 605.

4

In 2004, between Burrell's first and second trials, Oliver, the intended target of the shooting, was shot and killed. After a second trial, Burrell was found guilty of four of the original eight felony counts—premeditated first-degree murder, premeditated murder for the benefit of a gang, attempted premeditated first-degree murder, and attempted premeditated murder for the benefit of a gang. *Burrell II*, 772 N.W.2d at 464. The district court convicted Burrell of premeditated first-degree murder committed for the benefit of a gang and attempted premeditated first-degree murder committed for the benefit of a gang. *Id.* The court sentenced Burrell to life in prison plus 60 months for the first-degree premeditated murder conviction and to a consecutive term of 186 months in prison for the conviction of attempted premeditated first-degree murder committed for the benefit of a gang. *Id.* at 465. We affirmed Burrell's convictions following the second trial but remanded to correct the sentence because the district court had improperly imposed a longer sentence in the second trial, in violation of *State v. Holmes*, 281 Minn. 294, 296, 161 N.W.2d 650, 652 (1968). *Burrell II*, 772 N.W.2d at 469. We therefore vacated Burrell's sentence for his first-degree murder conviction and remanded for resentencing with instructions to the district court to impose a sentence of no longer than life plus 12 months on that count. *Id.* at 470.

Burrell filed a petition for postconviction relief in August 2011, seeking relief under four theories: newly discovered evidence, witness-recantation evidence, ineffective assistance of counsel for failure to call a witness, and police misconduct in coercing witness statements. In the petition, Burrell claimed the following: a new witness, Rita Brown, had come forward with allegedly exculpatory evidence; two witnesses from the

5

second trial, Terry Arrington and Anthony Collins, had recanted their testimony; codefendant Isaiah Tyson, who had testified at the second trial that he was the actual shooter, had recalled new details that would prove he was the shooter; and Antoine Williams, a witness from the first trial who did not testify at the second trial, also had "new evidence" about the shooting. None of this information was presented to the postconviction court in the form of affidavits directly from the witnesses or in sworn, notarized statements. Instead, Burrell submitted affidavits from a private investigator, Michael Morley,[1] who interviewed the witnesses and summarized their prospective testimony. In some instances, Morley attached handwritten, unnotarized statements or transcriptions of audio-recorded phone interviews to his own summaries. Brown, however, refused to write a letter or sign an affidavit, and there is no transcript of her interview with Morley.

The postconviction court summarily denied Burrell's claims based on ineffective assistance of counsel and police misconduct, but granted an evidentiary hearing to permit the testimony of Brown, Collins, Arrington, and Tyson. At the evidentiary hearing, on May 29, 2012, just one of the four witnesses, Tyson, appeared to testify. Collins and Brown could not be located. Burrell's counsel told the court that he had talked with Collins's supervised-release agent, and that there was a warrant out for Collins's arrest because he had failed to check in. Arrington did not testify because he was in federal

---

[1]    Morley died between the time he submitted the affidavits and the postconviction court's first evidentiary hearing. The record provides no details regarding the cause or circumstances of his death.

custody in Sherburne County, and according to counsel, had not been "writted over." The court continued the hearing for two days to provide time to locate Brown and to arrange transport for Arrington.

When the hearing reconvened on May 31, 2012, the three witnesses again did not appear. Burrell's counsel told the postconviction court he had reached Brown via telephone, and "she said she was not going to come testify and that she recanted her statements . . . ." Counsel did not pursue the Brown matter further at that time. Instead, he moved to declare Collins an unavailable witness and to admit a recorded statement that Collins previously had provided. He also moved for a continuance to "attempt to secure" Arrington's testimony after indicating that it would take one week for the U.S. Marshals to transport him to the hearing. The court denied both motions.

In June 2012, following a substitution of counsel, Burrell requested that the court reconvene the evidentiary hearing, based on assurances that proof would be provided that the witnesses had been subpoenaed again and that their whereabouts were known. In an offer of proof submitted in support of the request, counsel stated that he would provide new affidavits from the witnesses "or alternatively, proper notarization or attestation to its previously offered affidavits." The postconviction court granted the request and scheduled another evidentiary hearing for December 12 and 13, 2012. But, no new affidavits or notarizations were in fact provided to the postconviction court.

Because defense counsel did not subpoena witnesses in time for the December 2012 evidentiary hearing, the postconviction court granted a continuance until January 31, 2013. Following an in-chambers discussion regarding the transport of in-custody

7

witnesses, the postconviction court stated that it was not taking responsibility for making transport arrangements, nor did it order Burrell or the State to take any specific course of action to bring in the witnesses. On January 9, 2013, Burrell's counsel verbally requested an order to compel the Hennepin County Attorney's Office to secure the transport of three in-custody witnesses. The county attorney's office declined to assist with the witness transport, and the postconviction court refused to compel the county attorney's assistance. Although Brown was served with a subpoena on January 29, 2013, Brown, Arrington, and Collins did not appear at the January 31, 2013, hearing. The postconviction court did not issue any bench warrants, but granted a fourth continuance, to March 26, 2013, to allow additional time to secure witnesses and for counsel to contact the Minneapolis City Attorney's Office to pursue contempt charges against Brown.

The three witnesses did not appear at the March 26, 2013 evidentiary hearing, and no new subpoenas or orders of transport were issued for them. However, a fifth witness, Burrell's codefendant Hans Williams, had been transported from prison to the hearing to testify. The State successfully moved to exclude his testimony because Burrell had not included any allegation regarding Williams in his postconviction petition, nor was an offer of proof of Williams's testimony submitted to the postconviction court. The court recessed for one day to allow counsel to subpoena Brown or to otherwise secure her attendance. Defense counsel's efforts were unsuccessful, and the postconviction court denied Burrell's requests to issue a bench warrant for Brown or have law enforcement transport her to court.

On July 17, 2013, the postconviction court denied Burrell's postconviction petition. The court determined that Burrell had "provided virtually no additional evidence," and that the substance of any new evidence was "highly speculative" and "likely cumulative." The court concluded that it had provided Burrell with opportunities to present evidence from the witnesses, time for counsel to explore possible remedies to secure the witnesses' testimony, and multiple continuances. The court also held that it had no authority to issue a bench warrant for Brown's failure to appear at the March 26 or March 27, 2013, hearings because Brown had not been properly served with a subpoena for those dates.

## II.

The first issue is whether the postconviction court erred when it refused to compel the attendance of Burrell's witnesses—primarily Rita Brown—for an evidentiary hearing and thus, whether it erred when it denied Burrell's request for a new trial. We review the decision by the postconviction court to grant or deny a new trial based on new evidence for an abuse of discretion. *State v. Hurd*, 763 N.W.2d 17, 34 (Minn. 2009). In doing so, we review the postconviction court's underlying factual findings for clear error and its legal conclusions de novo. *Martin v. State*, 825 N.W.2d 734, 740 (Minn. 2013).

Burrell argues that, having decided Brown could provide relevant testimony, the postconviction court was required to either issue a bench warrant when she failed to appear on a subpoena for the January 31, 2013, hearing, or to "compel the creation of a criminal complaint for contempt of court." The postconviction court's failure to take either action, Burrell argues, deprived him of a meaningful postconviction review. These

9

arguments require consideration of the statutory and constitutional implications of disobedience of a subpoena.

A.

Failure to appear on a properly served subpoena is constructive contempt of court. Minn. Stat. § 588.01, subd. 3(8) (2014). "The district court is empowered to order [an individual's] arrest for . . . failure to appear" as a remedy for this contempt. *Braith v. Fischer*, 632 N.W.2d 716, 724 (Minn. App. 2001), *rev. denied* (Minn. Oct. 24, 2001); *Westgor v. Grimm*, 381 N.W.2d 877, 880 (Minn. App. 1986). To effectuate arrest, Minnesota courts may issue bench warrants to compel a witness or a defendant to come to court.[2] After the court is presented with an affidavit of the facts constituting the contempt, it:

> may either issue a warrant of arrest to bring the person charged to answer or, without a previous arrest, upon notice, or upon an order to show cause, which may be served by a sheriff or other officer in the same manner as a summons in an action, may commit the person to jail, impose a fine, or both, and make such order thereupon as the case may require.

Minn. Stat. § 588.04(a)(2014).[3] Thus, under the statute's plain language, a court has multiple options it "may" use when presented with contempt, but there is no *requirement* to issue a bench warrant.

---

[2]    A bench warrant is a "writ issued directly by a judge to a law-enforcement officer, esp[ecially] for the arrest of a person who has been held in contempt, has been indicted, has disobeyed a subpoena, or has failed to appear for a hearing or trial." *Black's Law Dictionary* 1819 (10th ed. 2014).

[3]    While the explicit statutory language requires affidavits or orders to show cause in cases of constructive contempt, we have held that a district court may issue a bench

(Footnote continued on next page.)

We note at the outset that defense counsel took little to no independent action to secure Brown's presence at the evidentiary hearing. First, counsel never presented the court with an affidavit of the facts constituting Brown's constructive contempt, as required under Minn. Stat. § 588.04(a), when Brown failed to appear for the January 31, 2013, hearing. Second, although given more than a 2-month continuance to do so, counsel failed to properly subpoena Brown to appear at the March 26 hearing and instead relied on the previous subpoena. Third, counsel never followed up on the court's suggestion to explore the possibility of criminal contempt charges against Brown. In short, Burrell cannot blame the postconviction court for failing to step in when his counsel was remiss in pursuing the remedies available to him.

In any event, even had counsel taken meaningful action, it likely would not have made a difference. The postconviction court was well within its discretion when it refused to compel the appearance of a potentially exculpatory, albeit reluctant witness. Although defense counsel repeatedly subpoenaed Brown, she refused to attend the hearings. The postconviction court, aware of Brown's refusals, granted multiple continuances. The court could have issued a bench warrant for Brown,[4] particularly after

(Footnote continued from previous page.)
warrant based solely on personal knowledge, obtained in its official capacity, of the contempt at issue. *State v. Mohs*, 743 N.W.2d 607, 613 (Minn. 2008).

[4]    District courts have the authority to compel witness attendance. *See Mohs*, 743 N.W.2d at 611 ("[T]he authority of courts to order that individuals who fail to appear as required by law be brought before the court is supported by the inherent authority of courts, by analogous precedent of the United States Supreme Court, and by the reasoning of other courts that have addressed this issue.").

11

she failed to appear at the January 31, 2013, hearing, but instead provided ample time for defense counsel to locate her, to pursue possible criminal contempt charges for disobeying the subpoena, or to otherwise secure her cooperation.[5]  In addition, it would have been inappropriate for the postconviction court to issue a bench warrant for Brown after the March 2013 hearing because she had not been properly subpoenaed.  In other words, the court properly exercised its discretion when it decided not to issue a bench warrant in response to a witness's failure to appear when that witness had not actually been subpoenaed to appear at the evidentiary hearing at issue.

Under the plain language of the statute governing contempt of court, a court has options at its disposal when facing a witness in contempt—it *may* issue a warrant or an order to show cause.  Minn. Stat. § 588.04(a).  To put it another way, the postconviction court's discretionary authority does not require the court to issue a bench warrant.  We therefore decline Burrell's invitation to adopt a judicial rule requiring postconviction courts to issue bench warrants for witnesses who fail to appear on subpoenas.  Such determinations are better left to the discretion of postconviction courts.  Accordingly, we hold that the postconviction court did not abuse its discretion when it declined to issue a bench warrant for Brown.

---

[5]     Although the postconviction court seemed to assume that Brown would have been charged with misdemeanor contempt, which is handled by the City Attorney's office, the proper charge may have been felony contempt, which is prosecuted by the State.  *See* Minn. Stat. § 588.20, subd. 1 (2014) (defining felony contempt as the knowing and willful disobedience of a subpoena lawfully issued in relation to a crime of violence).

B.

In addition to Minnesota's statutory framework, the United States and Minnesota Constitutions provide a criminal defendant with the right to subpoena favorable witnesses at trial. U.S. Const. amend. VI; Minn. Const. art. I, § 6 ("The accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."). At a minimum, the Supreme Court has held, "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). While Burrell contends that this right extends to postconviction proceedings, neither this court nor the Supreme Court have so held. *Cf. Coleman v. Balkcom*, 451 U.S. 949, 954 (1981) (Marshall, J., dissenting from denial of certiorari) ("A habeas corpus proceeding is, of course, civil rather than criminal in nature, and consequently the ordinary Sixth Amendment guarantee of compulsory process . . . does not apply.").

Even if, as Burrell contends, compulsory process is required to vindicate his right to a meaningful review of his conviction, the constitutional protection of compulsory process is not an absolute guarantee that every witness a defendant seeks must testify. Instead, assuming such a right applies to postconviction proceedings, to establish a violation of the Sixth Amendment right to compulsory process, a defendant "must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982).

Here, the record provides scant support to conclude that Brown's subpoenaed testimony would indeed have been "favorable" or "material," as required under *Valenzuela-Bernal*. We have recognized that the reliability provided by a sworn, notarized statement is a significant factor in the context of both recantation and newly discovered evidence when determining whether a new trial is warranted. *Miles v. State*, 800 N.W.2d 778, 784 (Minn. 2011); *see State v. Ferguson*, 742 N.W.2d 651, 660 (Minn. 2007); *Opsahl v. State,* 677 N.W.2d 414, 423 (Minn. 2004). Burrell's offer of proof regarding Brown's testimony originated solely from hearsay affidavits provided by Morley, a deceased third party. While we have recognized that, under certain circumstances, affidavits from third parties have sufficient indicia of trustworthiness, *see Caldwell v. State*, 853 N.W.2d 766, 770 (Minn. 2014); *Dobbins v. State,* 788 N.W.2d 719, 732-34 (Minn. 2010), Morley's affidavit summarizing Brown's interview does not contain such indicia. The postconviction court was never presented with any direct offers of proof from Brown regarding the substance of her testimony. The oral statement that Brown gave to Morley was neither given under oath nor reduced to written form, let alone notarized. There is no transcript of her interview or an accompanying writing of any kind from Brown. Furthermore, the postconviction court was told that Brown had recanted her previous statements and would refuse to testify in court as to what she allegedly had told Morley privately. Because the affidavits lacked adequate (or any) indicia of reliability, it would have been reasonable for the postconviction court to conclude that it could not "justify the expense and risk of transporting the [witness] to an evidentiary hearing . . . [without] a greater showing of a genuine recantation." *Ferguson*,

14

742 N.W.2d at 660. Thus, the postconviction court's refusal to issue a subpoena did not violate Burrell's alleged Sixth Amendment right to compulsory process.

III.

The second question in this appeal is whether the postconviction court abused its discretion when it refused to allow a codefendant witness, Hans Williams, to testify at the evidentiary hearing because he was not previously disclosed in Burrell's postconviction petition nor included in the court's order granting the hearing. Williams submitted an affidavit to the postconviction court after the evidentiary hearing had been granted, stating that he would testify that he had always maintained that Burrell was not present at the scene of the shooting. To obtain a new trial on the basis of newly discovered evidence, a petitioner must establish:

> (1) that the evidence was not known to the defendant or his/her counsel at the time of the trial; (2) that the evidence could not have been discovered through due diligence before trial; (3) that the evidence is not cumulative, impeaching, or doubtful; and (4) that the evidence would probably produce an acquittal or a more favorable result.

*Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997).

Burrell's offer of the testimony of Williams fails on each *Rainer* factor. A review of the record indicates that Williams testified at trial that Burrell was not present at the shooting, an assertion that mirrors his affidavit. Significantly, defense counsel never submitted a new offer of proof for Williams's testimony or told the postconviction court that Williams would testify to anything other than what he had already said. Thus, the evidence already was known and discovered by counsel at the time of trial, is cumulative,

15

and is not likely to produce a more favorable result. The postconviction court was well within its discretion when it denied permission to call Williams as a witness.

## IV.

Burrell also argues that the postconviction court, "without justification or legal support," declined to order a writ for the appearance of witness Terry Arrington, who was in the custody of the U.S. Marshals Service at the time of the evidentiary hearing. Burrell's argument is without merit. As an initial matter, the postconviction court was without authority to compel the presence of a witness in federal custody. *Cf. Tarble's Case*, 80 U.S. (13 Wall.) 397, 407 (1871) ("Such being the distinct and independent character of the two governments, within their respective spheres of action, it follows that neither can intrude with its judicial process into the domain of the other . . . ."). Furthermore, the record reveals that Burrell never requested the postconviction court's assistance in securing the assistance of federal marshals in arranging Arrington's transport. While Burrell sought a continuance at the May 31, 2012, hearing to discuss Arrington's transfer with an Assistant U.S. Attorney, the record does not support Burrell's claim that the postconviction court's assistance was requested in securing Arrington's transfer. Instead, counsel only requested leave to depose Arrington while he was in federal custody.

## V.

We turn next to Burrell's claim that his trial counsel was ineffective. Burrell argues that his trial counsel was ineffective because counsel did not hire a private investigator. But in his original petition to the postconviction court, Burrell's ineffective-

assistance-of-counsel claim hinged solely on the fact that counsel did not call Antoine Williams as a defense witness at the second trial. Because he did not expressly raise the failure-to-investigate claim in his postconviction petition, Burrell forfeited it on appeal to our court. "It is well settled that a party may not raise issues for the first time on appeal" from a denial of postconviction relief. *Robinson v. State*, 567 N.W.2d 491, 494 n.2 (Minn. 1997).

VI.

Finally, Burrell argues that the district court failed to correct his sentence as we ordered in *Burrell II*, 772 N.W.2d 459, 470 (Minn. 2009). After his first trial, Burrell received a sentence of life plus 12 months in prison for committing premeditated first-degree murder. After the retrial, the district court sentenced Burrell to life plus 60 months in prison for committing the same offense. We held in *Burrell II* that the longer sentence is not permitted under *State v. Holmes*, 281 Minn. 294, 296, 161 N.W.2d 650, 652 (1968). We therefore again remand for resentencing with instructions to the district court to impose a sentence of no longer than life plus 12 months for Burrell's premeditated first-degree murder conviction.

Affirmed in part, and remanded for the sentencing as directed.

GILDEA, C.J., took no part in the consideration or decision of this case.