*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0667**

State of Minnesota,
Respondent,

vs.

Donald William Laquier Jackson,
Appellant

**Filed March 2, 2015**

**Affirmed
Ross, Judge**

St. Louis County District Court
File No. 69DU-CR-12-3645

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Mark S. Rubin, St. Louis County Attorney, Kristen E. Swanson, Assistant County
Attorney, Duluth, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Bridget Kearns Sabo, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Kirk, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

Donald Jackson participated in a revenge attack that left a woman stabbed in the

heart and a man beaten with a baseball bat. Jackson pleaded guilty to aiding and abetting

first- and second-degree assault, his third and fourth violent-felony convictions in a ten-year period that included at least five years of his incarceration. Jackson challenges the district court's decision to deem him a dangerous offender and consequently impose an extended, consecutive-term sentence totaling 200 months in prison for the two offenses. Because the record supports the district court's finding that Jackson is a danger to public safety and because the district court did not abuse its discretion by admitting evidence relevant to that finding, we affirm the sentence.

**FACTS**

Just before midnight on October 12, 2012, Donald Jackson was walking in a Duluth alley with his sister Amber Holmes and friend Norman Cutbank. The three had been drinking. They encountered another group, including Brandon Quagon and Taylor Drift. Drift pushed Cutbank to the ground. Jackson, Holmes, and Cutbank returned to Holmes's house.

Cutbank was angry. Jackson, Cutback, and Holmes soon left the house and sought and found Quagon and Drift. Cutbank had a baseball bat, and Cutbank and Quagon fought over it. Jackson held Quagon back so Cutbank could punch Drift and hit her with the bat. Quagon was also beaten with the bat and Drift was stabbed in the heart.

Duluth police investigated, and the state charged Jackson criminally. Jackson admitted to the facts just outlined, and he pleaded guilty to aiding and abetting first- and second-degree assault. But Jackson was sparse with the details. He claimed that he did not have any contact with Drift and that he did not know who stabbed her. He said that his only role was to keep Quagon away. He acknowledged that he, Cutbank, or Holmes

2

must have stabbed Drift at some point during the fight but claimed that he never saw Cutbank or Holmes with a knife. He also asserted that he never saw who assaulted Quagon with the bat. The district court accepted Jackson's guilty plea to aiding and abetting the first-degree assault of Drift and the second-degree assault of Quagon.

The prosecutor had previously notified Jackson and the district court that the state would seek an upward sentencing departure. Jackson waived his right to a sentencing jury. The district court made sentencing findings after it conducted an evidentiary hearing. During the hearing, Jackson's counsel made a standing objection "to any improper opinion testimony concerning . . . Jackson being a danger to public safety" because "[i]t would invade the province of the fact finder." The district court overruled the objection.

Duluth police sergeant Robert Shene testified that in 2003 he was an investigator in the violent-crimes unit and had investigated a robbery-related homicide. A five-year-old boy had been shot dead during that robbery. The then-fifteen-year-old Jackson was one of the robbers. Jackson was not the shooter and he was not carrying a gun, but he was carrying a knife. The state introduced into evidence a certified copy of Jackson's extended juvenile jurisdiction (EJJ) delinquency adjudication for second-degree murder for that crime.

The district court also admitted into evidence a certified record of Jackson's 2009 conviction of second-degree assault in Beltrami County. Sergeant Shene did not investigate that assault, but he researched it to prepare for his testimony. The sergeant is the assistant commander of the department's tactical response team. In that role, he

3

reviews the operational plans for executing high-risk search warrants. He discussed the department's practice of completing a risk-assessment matrix before executing a search warrant. Sergeant Shene regularly completes the matrices to determine whether the subject of a search warrant is sufficiently dangerous to qualify for the tactical response team's involvement, and he assesses matrices that others complete. Sergeant Shene discussed how the risk-assessment matrix works:

> [The matrix] assigns values for different histories involved with the person or . . . what [we are] trying to find . . . . We assign point values for those risks, and the total value of the risk assessment determines whether the individual investigative unit can do it themselves, whether there has to be consultation with the tactical response team, or whether it requires tactical response team involvement.

The prosecutor presented a blank risk assessment matrix form, which the district court admitted into evidence over Jackson's objection. Sergeant Shene opined as to how the department would approach Jackson under the matrix in light of his 2004 adjudication, his 2009 conviction, and his current convictions. The sergeant concluded that Jackson's matrix results exceed the level that would trigger tactical-team involvement. Also over Jackson's objection, Sergeant Shene opined that Jackson presents a risk to public safety, based on the sergeant's "personal involvement with him during the homicide investigation . . . , his criminal history, . . . and the violence in that criminal history."

The district court found that Jackson is a danger to public safety under Minnesota Statutes section 609.1095, subdivision 2, due to his "high frequency rate of criminal activity or juvenile adjudications." It emphasized that he amassed four violent felony

4

convictions between 2004 and 2013 even though he had spent five of those years imprisoned. The state asked the district court to impose the statutory maximum prison sentence of 240 months. The district court declared that Jackson's base sentence is 146 months in prison for the first-degree assault and 21 months in prison for the second-degree assault, with the terms to be served consecutively. And because Jackson is a dangerous offender, the district court departed upward by 20% on both prison terms as authorized by section 609.1095. The district court therefore ultimately sentenced Jackson to consecutive terms of 175 months in prison for the first-degree assault and 25 months for the second-degree assault.

Jackson appeals the district court's finding that he is a dangerous offender.

## D E C I S I O N

Jackson calls into question the sufficiency of the evidence supporting the sentencing court's finding that he is a danger to public safety under the dangerous-offender statute. *See* Minn. Stat. § 609.1095, subd. 2 (2014). He also argues that the district court inappropriately admitted the police department's risk-assessment matrix into evidence and allowed Sergeant Shene to testify that he believed Jackson is a risk to public safety. The arguments do not lead us to reverse the sentence.

## I

The dangerous-offender statute permits the district court to impose a durational departure not otherwise authorized by the sentencing guidelines. *Neal v. State*, 658 N.W.2d 536, 545 (Minn. 2003). If circumstances meet the statutory requirements, the district court may impose an upward durational departure up to the statutory maximum,

even when the state does not prove severe aggravating factors. *Id.* The three statutory requirements are: (1) the offender was at least 18 years old at the time the felony was committed; (2) the offender had two or more prior convictions for violent crimes; and (3) the fact finder determines that the offender is a danger to public safety. Minn. Stat. § 609.1095, subd. 2; *Neal*, 658 N.W.2d at 543. The fact finder may base a finding of danger to public safety on the "offender's past criminal behavior, such as the offender's high frequency rate of criminal activity or juvenile adjudications, or long involvement in criminal activity." Minn. Stat. § 609.1095, subd. 2(2)(i).

Jackson does not challenge the findings as to the first two requirements. Nor could he; the record plainly supports the finding that Jackson was at least 18 years old when he assaulted Drift and Quagon, and his second-degree assault conviction and second-degree murder EJJ adjudication qualify as two prior convictions. *See State v. Jiles*, 767 N.W.2d 27, 29 (Minn. App. 2009) (holding that "EJJ adjudications are considered convictions for purposes of sentencing"), *review denied* (Minn. Aug. 26, 2009). Jackson argues only that the evidence cannot prove that he is a danger to public safety. We review a district court's decision to depart from a presumptive guidelines sentence for an abuse of discretion. *Vickla v. State*, 793 N.W.2d 265, 269 (Minn. 2011). We will not overturn a district court's findings in support of a departure if they are legally permissible and supported by the record. *Id.*

We hold that the third finding, that Jackson is a danger to public safety, has ample evidentiary support. During the ten years immediately preceding the sentencing, Jackson participated in four violent felonies. The four felonies resulted in four seriously or fatally

6

injured victims. That ten-year span included at least five years of incarceration in juvenile detention, jail, or prison, meaning that Jackson committed his four violent crimes during only about five years of freedom. These undisputed circumstances support the district court's finding that Jackson engaged in a high frequency rate of criminal activity, which in turn supports the finding that Jackson is a danger to public safety.

**II**

Jackson challenges the finding that he is a danger to public safety on the separate contention that the district court erroneously admitted into evidence the Duluth Police Department's risk assessment matrix and allowed Sergeant Shene to testify that he believes Jackson is dangerous. The district court has considerable discretion when making evidentiary rulings. *State v. Caine*, 746 N.W.2d 339, 349 (Minn. 2008).

Jackson contends specifically that the district court abused its discretion by allowing into evidence the department's matrix and the sergeant's opinion testimony, and he maintains that the evidence unfairly prejudiced him under Minnesota Rule of Evidence 403. He argues that the evidence improperly directed the fact finder to find a specific fact rather than properly arm the fact finder with evidence from which it could independently determine the disputed fact.

We are not persuaded by Jackson's argument. Jackson is correct that evidence is inadmissible if it is unfairly prejudicial, meaning that it "persuades by illegitimate means." *State v. Bell*, 719 N.W.2d 635, 641 (Minn. 2006). But we disagree with Jackson's contention that the disputed evidence is illegitimate because it is irrelevant to the finding that he is a danger to public safety. That police employ a deliberative process

7

to determine when a person's criminal experiences require intensified police tactics, and that Jackson's criminal experiences qualify him for this special high-risk treatment, are at least logically relevant to the statutory question of whether Jackson is a danger to public safety. Of course better and more relevant evidence exists, such as those specific facts that underlie Jackson's convictions. But this does not render the evidence irrelevant. And although the application of a law-enforcement risk-assessment tool is only minimally relevant, the supreme court instructs district courts that "excluding relevant evidence at a bench trial on the grounds of unfair prejudice is in a sense ridiculous" because "there is comparatively less risk that [a] district court judge, as compared to a jury . . . , would use the evidence for an improper purpose or have his sense of reason overcome by emotion." *State v. Burrell*, 772 N.W.2d 459, 467 (Minn. 2009) (quotation omitted).

Other than claiming irrelevance, Jackson fails to specify how the risk assessment matrix constituted an illegitimate means of persuasion. The matrix was developed by police officers and is used to assess plans for carrying out search warrants. It contains 12 subject-specific factors, many of which relate to the subject's past criminal behavior—a factor explicitly listed in Minnesota Statutes section 609.1095, subdivision 2 to determine whether a person endangers public safety. And Jackson also does not specify how Sergeant Shene's opinion constituted an illegitimate means of persuasion. Expert opinions embracing the ultimate issue are admissible if they are helpful to the fact finder. Minn. R. Evid. 702, 704. Although the assessment of a law enforcement officer as to Jackson's risk to public safety may not specifically track the statutory bases for a finding of danger, it may nevertheless help the fact finder for the reasons we have indicated.

8

Even if Jackson had persuaded us that either the matrix or the opinion testimony is irrelevant or otherwise illegitimate, he fails to demonstrate that he was prejudiced by the alleged error of admitting it. The district court did not appear to lean on the challenged evidence. Its sentencing order does not quote, mention, or refer to it. It instead focuses on Jackson's high frequency rate of criminal activity and the significant harm he caused his victims. And again, to the extent the relevance of the challenged evidence might be fairly characterized as marginal, we are reminded that it is "in a sense ridiculous" to suppose that the district court judge was illegitimately persuaded by it. Given the district court's stated rationale along with the undisputed evidence informing any rational mind that Jackson is a dangerous offender under the statute, it is impossible for us to suppose that the district court would have decided differently had it excluded the disputed evidence.

**Affirmed.**